## UNITED STATES *v.* SHERIDAN.

No. 53.   Argued November 12, 13, 1946.—Decided December 23, 1946.

*Leon Ulman* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, John R. Benney, Robert S. Erdahl* and *Sheldon E. Bernstein.*

*John H. Pickering* argued the cause and filed a brief for respondent.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

Sheridan was indicted on three counts for having violated § 3 of the National Stolen Property Act, as amended, 48 Stat. 794, 53 Stat. 1178, 18 U. S. C. §§ 413–419. A jury found him guilty on all counts.[1] On the authority of *Kann* v. *United States,* 323 U. S. 88, the Circuit Court of Appeals for the Sixth Circuit reversed the conviction. 152 F. 2d 57. Because of doubt as to the applicability of the *Kann* case, we granted certiorari.[2] 328 U. S. 829.

Each count charged that Sheridan, with fraudulent intent, caused the transportation in interstate commerce of a specified forged check, knowing it to have been forged. The proof [3] offered to support these counts showed that on July 19, 1943, in Jackson, Michigan, Sheridan cashed three checks, receiving for them either cash or cash and hotel service or goods. Two, which were made the basis

---

[1] The record states that respondent "having been fully informed of his constitutional right to counsel, and having been asked whether he desired counsel assigned, . . . stated he did not desire the assistance of counsel."

[2] Since certiorari was granted *Clarke* v. *Sanford,* 156 F. 2d 115, has been decided by the Fifth Circuit. It appears to be in conflict with the case at bar. See also *Tolle* v. *Sanford,* 58 F. Supp. 695.

[3] The proceedings at trial were not stenographically reported. Hence the parties prepared a statement of evidence from memory and from notes made during the course of the trial, and stipulated that it "substantially sets forth the testimony and evidence" presented by the Government. Upon approval of the District Court, the statement was made part of the record.

of counts one and two, were drawn on a bank in Cape Girardeau, Missouri, were payable to the order of "P. H. D. Sheridan," and purported to be drawn by "U. S. E. F. C. 14A A. J. Davis, Commissioner." As will be seen, it is not necessary to consider the third count, involving the other check.

From the endorsements it was clear that each check had been cashed by or deposited in banks at Jackson, Michigan. They forwarded the two checks drawn on the Missouri bank to it for payment. Both were marked "no account" and returned unpaid to the forwarding bank. An agent of the Federal Bureau of Investigation testified that his office had conducted an investigation in Washington, D. C., and that the United States Department of Commerce had no agent "U. S. E. F. C. 14A," nor one "A. J. Davis, Commissioner."

Sheridan was sentenced to five years' imprisonment on each count, the sentences to run concurrently. Hence, if the conviction on any is valid, it is unnecessary to consider the convictions on the other two. *Hirabayashi* v. *United States,* 320 U. S. 81, 85; *Pinkerton* v. *United States,* 328 U. S. 640, 641, n. 1. Accordingly, for the purposes of this decision it may be taken that only the convictions on counts one and two are in issue.[4]

## I.

The pertinent part of amended § 3 is set out in the margin.[5] Whether or not Sheridan's situation is within

---

[4] Count two is identical in effect with count one for the purposes of the argument made here. Count 3, however, involves a check signed by respondent in his own name as maker, and the Government—apparently of the view that such a check is not "altered" or "counterfeited"—states: "It is not clear that such a check is falsely made or forged within the general law."

[5] The pertinent text of § 3 is as follows: "Whoever shall transport or cause to be transported in interstate or foreign commerce any goods

the intended coverage depends upon the answer to be given to two questions, namely: (1) Did he *cause* to be transported in interstate commerce any forged security; [6] (2) if so, did he do this "with unlawful or fraudulent intent"? It is in these respects that the section's meaning must be determined.

It is not questioned that the checks were "securities," that they were "forged," or that they were transported in interstate commerce.[7] It is urged, however, that Sheridan did not "cause" the transportation, since his objective was attained when he cashed the checks and what happened to them later was of no consequence to him or his plan. Hence it is concluded that he can be said to have "caused" the transportation only in the sense that it would not have occurred if he had not cashed the checks. This "but for" relation is considered insufficient since the statute is thought not simply to forbid use of interstate

---

wares, or merchandise, securities, or money, of the value of $5,000 or more theretofore stolen, feloniously converted, or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen, feloniously converted, or taken, *or whoever with unlawful or fraudulent intent shall transport or cause to be transported in interstate* or foreign *commerce any falsely made, forged,* altered, or *counterfeited securities, knowing the same to have been falsely made, forged,* altered, or counterfeited, or whoever with unlawful or fraudulent intent shall transport, or cause to be transported in interstate or foreign commerce, any bed piece, bed plate, roll, plate, die, seal, stone, type, or other tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security, or any part thereof, shall be punished by a fine of not more than $10,000 *or by imprisonment for not more than ten years, or both . . . ."* 48 Stat. 794, 795, as amended by 53 Stat. 1178. (Emphasis added.)

[6] The Act, § 2 (b), defines the term "securities" as including checks.

[7] The sufficiency of the evidence to prove the fact of forgery is challenged, cf. Part III, but for the purposes of the principal contentions, it is conceded *arguendo.*

commerce for transportation of forged securities without more, but to outlaw such use only when it contributes to or is an essential part of carrying out the intended specific fraud.

The second contention, though stated differently, comes substantially to the same thing. It is that, upon the assumption Sheridan may be held to have "caused" the transportation, still he did not do so with the requisite "unlawful or fraudulent intent," namely, to aid in completing the fraud. These views are bolstered by strong reliance on the *Kann* decision.

The Government answers with essentially two arguments. One is drawn primarily from the embodiment of amended § 3 in the National Stolen Property Act. It is shortly that the offense takes color and character from the other offenses with which it is associated in the context of § 3. Broadly, therefore, the Government says that the section as amended excludes forged securities from interstate transportation just as it does stolen goods,[8] money or securities, counterfeited securities and counterfeiting tools; or, for that matter, just as diseased cattle, lottery tickets, adulterated foods, etc., are excluded under various statutes related to the National Stolen Property Act.[9] More narrowly the Government argues that the

[8] See Hearings before the Committee on the Judiciary on H. R. 10287, 70th Cong., 1st Sess.; H. Rep. 2528, 70th Cong., 2d Sess.; H. Rep. 1462, 73d Cong., 2d Sess.; S. Rep. 538, 73d Cong., 2d Sess.; H. Rep. 1599, 73d Cong., 2d Sess.; H. Rep. 422, 76th Cong., 1st Sess.; S. Rep. 674, 76th Cong., 1st Sess.

See note 5 for pertinent text of § 3.

[9] The National Stolen Property Act is said to be modeled after the National Motor Vehicle Theft Act, 41 Stat. 324. H. Rep. 2528, 70th Cong., 2d Sess., 4; H. Rep. 1462, 73d Cong., 2d Sess., 2.

See also the Animal Industry Act of 1884, 23 Stat. 31; the Act for the Suppression of Lottery Traffic of 1895, 28 Stat. 963; the Pure Food and Drug Act of 1906, 34 Stat. 768; the White Slave Traffic Act of 1910, 36 Stat. 825; the Webb-Kenyon Act of 1913, 37 Stat. 699.

transportation here necessarily aided or contributed to the perpetration of the fraud, if not by enabling respondent to secure possession originally of its fruits, then by giving him the necessary interval to make his escape and thus to avoid either prosecution or restitution of the amount which early detection would make probable.

As an entirely fresh matter, we should have difficulty in avoiding the force of the Government's views. The setting of the offense in amended § 3, together with the complete absence of anything in the legislative history to indicate that causing interstate transportation of forged securities was designed to be treated differently from causing the transportation of stolen goods, counterfeited securities, counterfeiting tools, etc., indicates plainly that transporting all these articles is to be treated in the same manner and, moreover, not in the limited sense for which respondent argues.

Congress had in mind preventing further frauds or the completion of frauds partially executed. But it also contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful getaway and thus make the state's detecting and punitive processes impotent.[10] This was indeed one of the most effective ways of preventing further frauds as well as irrevocable completion of partially executed ones. In the light of this purpose, we do not believe that Congress intended to restrict the pro-

---

[10] See H. Rep. 2528, 70th Cong., 2d Sess., 2: "Most of the States have laws covering the underlying principle of this proposed legislation, but it must be remembered that the jurisdiction of the State court does not reach into all of the States, especially when the matter of producing witnesses and bringing to the court the proof is concerned." See also Hearings before the Committee on the Judiciary on H. R. 10287, *supra* note 8, *passim*.

hibited transportation of stolen goods, securities and money, or of counterfeited securities and counterfeiting tools, to situations where it would be effective to complete a specific fraud, in the sense of enabling the defrauder to secure possession initially of what he seeks. The intent was more general.

It is true that amended § 3 forbids the interstate transportation of forged and counterfeited securities, and forging and counterfeiting tools, "with unlawful or fraudulent intent," while the earlier-proscribed transportation of stolen goods, securities and money is not required in terms to be done with such an intent, but only with knowledge that they have been stolen. This difference would seem to be entirely procedural, not substantive in character.[11] But, in any event, it is not controlling here. For the question remains whether the *Kann* case requires us to hold that "with unlawful or fraudulent intent" must be taken as restricting the forbidden transportation to cases where that element aids in originally securing the fruits of the fraud.

---

[11] One who knowingly transports stolen goods would do so for one of three sorts of objects, namely: (1) to dispose of them or use them unlawfully; (2) to aid in concealing the theft, thus avoiding prosecution for himself or another; or (3) for some purpose wholly innocent, such as to turn them over to the police or the rightful owner.

In the first two instances there would be inherent in the act "unlawful intent" or "fraudulent intent," though proof of this might not be required apart from the proof of knowledge and absence of any showing of innocent purpose. Congress obviously did not intend to make criminal such an instance as the third. However, proof of the innocent intent might be required as matter of defense, the other elements being made out. In other words, it may well be doubted that adding the requirement "with unlawful or fraudulent intent" in the amended part of the section added anything to the substantive crime; for its effect is apparently only to require the state to allege and prove the unlawful or fraudulent intent, rather than to require the defendant to allege and prove his innocent purpose.

## II.

That case held that one alleged to be party to a fraudulent scheme could not be convicted under § 215 of the Criminal Code, 18 U. S. C. § 338, for using the mails *"for the purpose of executing such scheme,"* by proving that he or his associates cashed checks, receiving the proceeds at forwarding banks, which in turn mailed them to the drawee banks for collection, the checks being neither forged nor dishonored by the banks on which they were drawn. We think the case is distinguishable both on the statutes applied and on the facts. In order that comparison may be exact, we set forth the applicable wording of the two sections.

Section 215 of the Criminal Code, involved in the *Kann* case, is as follows: "Whoever, *having devised . . . any scheme* or artifice *to defraud,* or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . *shall, for the purpose of executing such scheme* or artifice or attempting so to do, place, or cause to be placed, any letter . . . in any post office, or . . . cause to be delivered by mail according to the direction thereon . . . any such letter, . . . shall be fined not more than $1,000, or imprisoned not more than five years, or both." (Emphasis added.)

Amended § 3 of the Stolen Property Act reads pertinently, except for its important contextual coloring: [12] ". . . whoever *with unlawful or fraudulent intent* shall transport or cause to be transported in interstate . . . commerce any *falsely made, forged,* altered, or counterfeited securities, *knowing the same to have been falsely made, forged,* altered, or counterfeited, . . . shall be punished by a fine of not more than $10,000 or by imprisonment for not more than ten years, or both . . ." (Emphasis added.)

[12] See note 5.

Under § 215 the express requirement is that the mailing or causing to be delivered by mail shall be "for the purpose of executing such scheme or artifice or attempting so to do." There is no such explicit requirement in amended § 3. The wording there is that the interstate transportation shall be done "with unlawful or fraudulent intent." This different wording and the difference in the contextual settings of the proscriptions have meaning, we think, to make their effects distinct. We emphasize at the outset that amended § 3 is part of a scheme of federal-state cooperation in apprehending and punishing criminals, while § 215 deals only with a distinctly federal crime.

The language of amended § 3 is broader and less specific than that of § 215. The word "unlawful" in the former is not to be ignored. Nor is it to be rendered meaningless by identifying it with "fraudulent," more especially if the latter is to be endowed with the restrictive connotation, not expressly stated, of "for the purpose of executing such scheme." The word "unlawful" has no such narrow meaning. Literally it is broad enough to include any unlawful purpose, such as to aid in concealing what has been done and thus in avoiding prosecution and restoration.

Moreover, in the *Kann* setting, the quoted wording now sought to be read into amended § 3 was restricted to significance in relation to getting the proceeds of the checks *irrevocably,* and the subsequent mailing was held to have no significant influence in producing that effect or, therefore, upon completing the scheme; [13] or, moreover, toward concealing the crime.

Whether or not in those circumstances the mailing had concealing effects, the situation in this respect was very different from the one now presented. The checks there

---

[13] It was as to this conclusion that four members of the Court dissented. 323 U. S. at 95.

were not forged or altered. Here they were. There the checks were honored by the drawees after the mailing. Here they were dishonored after the transportation. There the payee-indorsers knew they would not be. In that case the mailing was much less likely to produce disclosure than was the transportation in this one. Accordingly the irrevocable completion of the scheme was much less affected by the mailing than it was by the transportation here. So also with any concealing effect of the transportation and, therefore, with any unlawful or fraudulent intent concerning it.

Indeed the *Kann* opinion recognized that in other circumstances a different result might be called for, even under the explicit and restricted purposive requirement of § 215. For in putting aside the cases sustaining convictions where use of the mails was "a means of concealment so that further frauds which are part of the scheme may be perpetrated," [14] the Court said: "In these the mailing has ordinarily had a much closer relation to further fraudulent conduct than has the mere clearing of a check, although it is conceivable that this alone, in some settings, would be enough." 323 U. S. at 95.

The Court was not dealing with the transmission of a forged check, certain to be dishonored after the mailing or transportation, or therefore with a situation in which the forbidden transmission was either so likely to result in disclosure of the crime or so obviously intended to provide an interval for escape before that disclosure would be made.[15] We cannot say that in circumstances such as are now here the same result would have been reached in applying § 215, in view of these differences and the express

[14] *United States* v. *Lowe*, 115 F. 2d 596; *Dunham* v. *United States*, 125 F. 2d 895; *United States* v. *Riedel*, 126 F. 2d 81.

[15] The discovery of the scheme resulted from an examination of the allegedly defrauded corporation's books by a Government examiner, not as here from return of the checks unpaid by the forwarding bank.

reservation made for other situations involving greater possibilities for concealment.

This is enough to distinguish the *Kann* case. But we think, in addition, we would be altogether unjustified to rewrite the words "with unlawful or fraudulent intent" to mean "for the purpose of executing such scheme or artifice" in the sense of aiding to secure possession of the proceeds of the checks irrevocably, which was the meaning given that phrase in the *Kann* decision. Apart from the absence here of irrevocability in the legal sense, to do this would be to disregard what we think was Congress' clear purpose to make amended § 3, like the section in its original form, a means of apprehension and of punishment substantially, though not strictly in the legal sense, for past crimes of the sort specified in situations where interstate commerce was used as a method of defeating the state's exercise of those functions.

We cannot thus tear the transportation of forged checks from its setting and give it the distinct status, with reference to intent, as compared with the other forbidden transportations, which we think would result from respondent's reading. In amending § 3 Congress was extending the federal law enforcement arm to reach primarily the larger dealers in forged and counterfeited securities.[16] Not only forged checks, but forged or counterfeited bonds and coupons, as well as other forms of securities, and the instruments with which these are made, were the target. The legislative history shows that the purpose was to bring operators in these false securities into substantially the same reach of federal power as applied to others dealing in stolen goods, securities and money.[17] In one respect the object was to make their apprehension

---

[16] See the letter from the Attorney General to Senator Ashurst, Chairman of the Senate Committee on the Judiciary, set out in S. Rep. 674, 76th Cong., 1st Sess., 2.

[17] *Ibid.*

and conviction more easy, for the $5,000 minimum in value was intentionally omitted. The amendment was thus an extension, not a contraction of the preexisting provisions.

The purpose however was not to reach persons innocently, but knowingly, transporting the forbidden articles. Hence it was necessary to introduce safeguarding language. This was done by inserting "with unlawful or fraudulent intent." Broad as this was, it was sufficient for the purpose of excluding innocent transportation. We do not think it was also intended to safeguard the counterfeiter or professional forger, simply because the transportation alleged and proved does not aid him initially in securing the possession of the proceeds of his fraudulent dispositions. To take this view would nullify much of the amendment's intended effectiveness.

Nor can we treat forged checks differently from other securities, either because they are forged or because the forgery is done by "little fellows" who perhaps were not the primary aim of the congressional fire. The statute expressly includes checks.[18] It makes no distinction between large and small operators. There is no room for implying such a distinction in view of the absence of the $5,000 limitation with respect to the transportation of forged checks. Whether or not Congress had in mind primarily such small scale transactions as Sheridan's, his operation was covered literally and we think purposively. Had this not been intended, appropriate exception could easily have been made.

If it is assumed that the evidence supports the conclusions on which the case has come here,[19] Sheridan perpetrated three frauds, including two forgeries, in one day. Forgery, thus repeated, is not amateurish, though the

[18] See note 6.
[19] See Part III.

amounts obtained are small. Notoriously the crime done once becomes habitual. And forgers are notoriously itinerant. Drawing the check upon an out-of-state bank, knowing it must be sent there for presentation, is an obviously facile way to delay and often to defeat apprehension, conviction and restoration of the ill-gotten gain. There are sound reasons therefore why Congress would wish not to exclude such persons, among them the very ease with which they may escape the state's grasp.

A word will dispose of the idea that Sheridan did not "cause" the transportation. Certainly he knew the checks would have to be sent to the Missouri bank for collection. Given the proven forgery and uttering, no other conclusion would be possible. Necessarily, too, it would follow he intended the paying bank to send the checks there for that purpose. He knew they must cross state lines to be presented. One who induces another to do exactly what he intends, and does so by defrauding him, hardly can be held not to "cause" what is so done. The *Kann* case itself is authority for the Government on this point, in fact goes farther than is necessary here. For, as respected the same contention there advanced, the opinion said: ". . . we think it a fair inference that those defendants who drew, or those who cashed, the checks believed that the banks which took them would mail them to the banks on which they were drawn, and, assuming the petitioner participated in the scheme, their knowledge was his knowledge." 323 U. S. at 93. The statement was in answer to argument that Kann had not "caused" the mailing.

### III.

Since the Circuit Court of Appeals reversed the conviction on all counts on its view that the *Kann* case was controlling, it did not discuss respondent's other contentions. These are renewed here. They are, first, that the evidence was insufficient to support the verdict; and, second, that

certain testimony was inadmissible, including that of the federal agent to the effect that the Department of Commerce had no agency "U. S. E. F. C. 14A" nor one "A. J. Davis, Commissioner." On the facts the two contentions are closely related.[20]

We express no opinion as to the admissibility of the evidence. It is desirable that the litigants and this Court, if the case is again before us, have the benefit of the views of the Circuit Court of Appeals. See *United States* v. *Ballard,* 322 U. S. 78, 88. However, with respect to the first contention, upon the assumption that the record, as stipulated, correctly sets forth the evidence introduced by the Government and also that all the evidence was admissible, it follows from our discussion of the statute that the evidence was sufficient to send the case to the jury. The jury properly could have inferred that respondent had forged the checks in question; [21] that he therefore had knowledge of their spurious character; and, furthermore, that the checks were negotiated and caused to be transported with unlawful or fraudulent intent.

However, counsel assigned here for respondent calls our attention to the fact that the instructions given and the rulings on instructions requested do not appear in the record. He suggests that, if the cause should be remanded to the Circuit Court of Appeals for further proceedings, it would be appropriate for us to suggest to that court in the remand that it exercise its powers to secure a complete bill of exceptions, including the instructions given and all pertinent rulings in connection therewith.

That course has been followed in unusual circumstances. See *Miller* v. *United States,* 317 U. S. 192, 199–200; *Hel-*

---

[20] It is argued that excluding the evidence regarded as inadmissible would render the remaining evidence insufficient.

[21] That is, the checks which form the basis of counts 1 and 2. We express no opinion concerning the check on which count 3 was based. See note 4.

*wig* v. *United States,* 328 U. S. 820. Such circumstances are presented on this record. Respondent defended himself at the trial. He did not have counsel on the appeal. The case is here *in forma pauperis,* and it is stated in his brief that "respondent is now confined in a Michigan state prison, is without funds and is unable to employ counsel of his own choice." Since the decision in *Miller* v. *United States, supra,* the Federal Rules of Criminal Procedure have taken effect [22] and expressly provide that they shall govern all proceedings pending at the effective date "so far as just and practicable." [23] Rule 59. Bills of exception are abolished.[24] Since the record contains a statement of the evidence, apparently the only serious deficiency is in the matters relating to the instructions, noted above. In these circumstances we think taking any corrective action, in this respect or otherwise, in the interest of seeing that substantial justice is done, well may be left to the judgment of the Court of Appeals.

The judgment is reversed and the cause is remanded to that court for further proceedings in conformity with this opinion.

THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS dissent.

---

[22] 18 U. S. C. following § 687, effective March 21, 1946.

[23] In this case the indictment was filed on October 27, 1944; the jury verdict and judgment were filed on November 30, 1944; the judgment of the Circuit Court of Appeals was entered on November 19, 1945; and a Government petition for rehearing was denied on January 28, 1946. Certiorari was granted on May 13, 1946.

[24] See Rule 39 (c) and the note prepared under the direction of the Advisory Committee on Rules for Criminal Procedure. "The new rule supersedes Rules VII, VIII, and IX of the Criminal Appeals Rules of 1933, 292 U. S. 661. One of the results of the change is the abolition of bills of exceptions." S. Doc. 175, 79th Cong., 2d Sess., 62–63.