**UNITED STATES of America,
Appellee,**

v.

**George JOHNSON, Defendant-
Appellant.**

United States Court of Appeals
Second Circuit.

Presented Oct. 1, 1956.

Decided Nov. 9, 1956.

---

George Johnson, pro se.

Cornelius W. Wickersham, Jr., Chief Asst. U. S. Atty., for the Eastern Dist. of New York, Brooklyn, N. Y., in opposition.

Before FRANK, MEDINA and HINCKS, Circuit Judges.

HINCKS, Circuit Judge.

This is a motion addressed to this court for leave to appeal *in forma pauperis* and for assignment of counsel. The petition also, at least impliedly, seeks an order requiring the United States "to prepay the costs of the minutes and records of all proceedings."

The movant after a five days' trial by jury in the District Court for the Eastern District of New York was convicted and on May 24, 1956 sentenced to a term of three years. On May 25, 1956 the movant filed a notice of appeal from said judgment. On May 25, 1956 he also addressed a petition to the trial court for leave to appeal *in forma pauperis* supported by a poverty affidavit the sufficiency of which is not disputed. In said petition he asserted, without further particularity, that "many prejudicial errors were committed against me and I therefore need the records and minutes to present them to the United States Circuit Court of Appeals for the Second Circuit."

In a written opinion dated June 1, 1956 Judge Rayfiel denied the petition saying: "The issues in the case were simple. The jury was adequately and properly instructed as to the law. The evidence amply supported its verdict. I am satisfied, and accordingly certify that the appeal is frivolous, lacking in merit, and not taken in good faith."

The petition addressed to this court, like that denied below, includes a poverty affidavit and a sworn statement that the petition is made in good faith, under belief that the movant is entitled to the relief sought. But there is nothing in the pending petition and nothing elsewhere in the record now presented to us, which shows that the certificate below was made without warrant and not in good faith.

Title 28 U.S.C.A. § 1915(a) provides: "An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith." This statutory prohibition is applicable to the instant petition. Wells v. United States, 318 U.S. 257, 63 S.Ct. 582, 87 L.Ed. 746; Dorsey v. Gill, 80 U.S.App. D.C. 9, 148 F.2d 857, 877 and 878, certiorari denied 325 U.S. 890, 65 S.Ct. 1580, 89 L.Ed. 2003; Bernstein v. United States, 4 Cir., 195 F.2d 517, certiorari denied 343 U.S. 980, 72 S.Ct. 1081, 96 L.Ed. 1371; Johnson v. Hunter, 10 Cir., 144 F.2d 565; Parsell v. United States, 5 Cir., 218 F.2d 232. The books are replete with other federal decisions to the same effect.

In Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 589, the majority opinion proceeded on the assumption that in that case "errors were committed in the trial which would merit reversal": it was not addressed to the problems involved in frivolous appeals. In his con-

curring opinion, Justice Frankfurter said, 351 U.S. at page 24, 76 S.Ct. at page 593, "When a State not only gives leave for appellate correction of trial errors but must pay for the cost of its exercise by the indigent, it may protect itself so that frivolous appeals are not subsidized and public moneys not needlessly spent." Such self-protection, we suggest, is also in the public interest for its impact on the prompt disposition of criminal administration: court dockets crowded with meritorious appeals should not be further burdened by frivolous appeals. In the federal system these considerations are dealt with in 28 U.S.C.A. § 1915. We see nothing in Griffin which suggests that the protection to the Government and the public afforded by that statute, as interpreted by the long line of federal cases referred to above, offends the Due Process or the Equal Protection Clauses, Const. Amend. 5.

We do not view the instant case as one of a person who is punished because he is guilty of the crime of being poor. He is punished because a jury in a court of unquestioned jurisdiction found him guilty of a serious crime beyond a reasonable doubt. And he is not entitled to the assistance which the law provides for a poor person in the prosecution of an appeal because Congress, by 28 U.S.C.A. § 1915(a), has directed that such assistance shall be withheld if the trial judge shall certify that the appeal is not taken in good faith. Certainly the deprivation of aid to prosecute a frivolous appeal is not "punishment." And it laid well within the Congressional power to designate the trial judge as the authority to determine whether a given appeal is frivolous. Such a determination is final, absent a showing that the trial judge acted "without warrant or not in good faith." Wells v. United States, supra [318 U.S. 257, 63 S.Ct. 584]. As noted above, there is no such showing here.

The motion is wholly denied.

FRANK, Circuit Judge (dissenting).

1. Before 1956 when the Supreme Court decided Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, the courts, in cases cited by my colleagues, had held in effect that no constitutional question arose when there existed a discrimination against a man, solely because of his poverty, seeking to appeal from a judgment of conviction; the courts reasoned that no one had a right to appeal and therefore such a discrimination did not affect any constitutional rights.[1] But in Griffin the Supreme Court declared that, once a state provides for appeals from convictions, such a discrimination against the poor violates the Fourteenth Amendment's guaranty of due process and equal protection of the laws. It would seem clear that the Griffin doctrine, via the due process provision of the Fifth Amendment, applies as well to a poor man's appeal from a federal conviction.[2]

The Griffin doctrine therefore brings sharply into focus the correct interpretation and effect of that part of 28 U.S. C.A. § 1915(a) which reads, "An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith." Were that language interpreted literally—so that the trial judge's certificate, his mere fiat, would not be reviewable—the statute, I think would fall foul of the Griffin doctrine, for it would mean this:

(1) If a convicted man has the money to pay the docket fee and for a transcript of the proceedings at his trial, the upper federal court, by at least reading the

1. See, e. g., Dorsey v. Gill, 80 U.S.App. D.C. 9, 148 F.2d 857, 877; Higgins v. Steele, 8 Cir., 195 F.2d 366, 368; Cf. United States ex rel. Kalan v. Martin, 2 Cir., 205 F.2d 514; U. S. ex rel. Rheim v. Foster, 2 Cir., 175 F.2d 772. But cf. United States ex rel. Embree v. Cummings, 2 Cir., 233 F.2d 188; U. S. ex rel Rhyca v. Cummings, 2 Cir., 233 F. 2d 190; U. S. ex rel. St. John v. Cummings, 2 Cir., 233 F.2d 187.

2. Bolling v. Sharpe, 345 U.S. 972, 73 S. Ct. 1117, 97 L.Ed. 1388.

transcript, will ascertain whether or not there was reversible error at the trial, or whether or not there was such a lack of evidence that the defendant is entitled to a new trial or a dismissal of the indictment.

(2) If, however, the defendant is so destitute that he cannot pay the docket fee, and if the trial judge has signed a certificate of "bad faith," then although a reading of the transcript shows clear reversible errors, the federal appellate court is powerless to hear the appeal and thus to rectify the errors; and even if the defendant has money enough to pay the docket fee but not enough for a transcript, the upper court usually has no way of determining whether there were such errors, must therefore assume there were none, and must accordingly refuse to consider his appeal. As a consequence, a poor man erroneously convicted—e. g., where there was insufficient proof of his guilt—must go to prison and stay there. In such a situation—i. e., where the upper court, if it had the transcript before it, would surely reverse for insufficiency of the evidence or on some other ground, but cannot do so solely because the defendant cannot pay for a transcript—the result is this: *He is punished because he is guilty of the crime of being poor* (more or less on the principle, openly avowed in Erewhon only, that one who suffers misfortunes deserves criminal punishment).[2a]

This must be the consequence if the trial judge's certificate is not reviewable. It is no answer to say, as my colleagues do, that "the deprivation of aid to prosecute a frivolous appeal is 'not punishment.'" For such a literal interpretation of the statute will prevent the upper court from ascertaining whether or not the appeal is frivolous; if, in truth, it is not frivolous but the defendant, due to his poverty, is not permitted so to demonstrate, then, I think, he is punished for the crime of poverty.

Were the literal interpretation adopted, the statute would plainly discriminate against the poor. For then a trial judge who had committed grave errors, could usually, by a "bad faith" certificate, (a) block an appeal by an indigent defendant as (b) the judge could not do in the case of a well-to-do defendant. Doubtless, seldom would a trial judge seek thus to prevent an indigent's appeal when the judge had some doubt whether there were reversible errors. But a trial judge, in all honesty, may believe the trial free of error. In the instant case the trial judge stated, "The jury was adequately and properly instructed as to the law"; but experience teaches that not too infrequently a trial judge mistakenly entertains such a view of his instructions to the jury.

Fortunately, cases cited by my colleagues[3] go to show that, even before Griffin, the courts had rejected the harsh literal interpretation of the statute. Those cases hold that the trial judge's "bad faith" certificate is not final if the defendant shows the upper court that the trial judge, in making his certificate, acted "without warrant or not in good faith." In other words, those cases hold, in effect, that the trial judge's certificate of "bad faith" enjoys no unqualified finality, that the execution of such a certificate is discretionary, and that it will be disregarded if it is made to ap-

---

**2a.** Butler reports that, in Erewhon, "Ill luck of any kind, or even *ill treatment at the hands of others, is considered an offense against society, inasmuch as it makes people uncomfortable to hear about it.* Loss of fortune, therefore * * · * is punished hardly less than physical delinquency." He quotes a judge who told a defendant, "I should point out that even though the jury had acquitted you * * * I should have felt it my duty to inflict a sentence hard-

ly less than that which I must pass at present; for the more you had been found guiltless of the crime imputed to you, the more you would have been guilty of one hardly less heinous—I mean that *crime of having been maligned unjustly.*" Butler, Erewhon (Everyman's Library ed., 1917), 94, 116; cf. 80.

**3.** See, e. g., Wells v. U. S., 318 U.S. 257, 63 S.Ct. 582, 584, 87 L.Ed. 746; Higgins v. Steele, 8 Cir., 195 F.2d 366, 368; Parsell v. U. S., 5 Cir., 218 F.2d 232.

pear to the appellate court that the trial judge "abused" his discretion. This I interpret to mean that if it is made to appear to the appeal court that there is merit in a poor man's claims of errors at the trial, an appeal in *forma pauperis* will be allowed, notwithstanding the trial judge's adverse certificate.[4]

But how can the existence of such a meritorious appeal be shown unless the defendant has access to a transcript of the events at the trial? My colleagues' opinion fails to answer that question. The pre-Griffin cases seem, at first glance, to have left this problem unsolved. They seem to say, what I think my colleagues say: "Yes, we will give you permission to appeal in forma pauperis—if you can prove what we will prevent you from proving." [4a] For suppose that, in fact, a trial judge, in uttering a "bad faith" certificate, did "abuse" his discretion; nevertheless, absent a transcript (which the indigent defendant is unable to buy) it would seem that, usually [5] the defendant cannot show that there was such an "abuse," i. e., that the

appeal has merit (in that, e. g., the evidence included a coerced confession or inadmissible and prejudicial testimony, or the prosecutor indulged in highly inflammatory and improper remarks to the jury).[5a]

Consider, for instance, United States v. Provoo, 2 Cir., 215 F.2d 531 where we reversed a conviction because the trial judge admitted irrelevant and most prejudicial evidence. Suppose that, in that case, the defendant, on account of poverty, had been unable to obtain a transcript and that the trial judge had issued a "bad faith" certificate. According to my colleagues, defendant's conviction would then have stood unreversed, since it would then have been impossible for defendant to reveal to our court the grave trial error or to show us that the trial judge, in issuing his certificate, acted " 'without warrant or not in good faith.' " I submit that such a result would be squarely in conflict with the Griffin doctrine: It would constitute a discrimination against a poor man, because a wealthy defendant in the same

**4.** In Bernstein v. U. S., 4 Cir., 195 F.2d 517, cited by my colleagues, the court of appeals denied a petition to appeal *in forma pauperis* because, without a transcript, it concluded that the record before it did not show that the trial judge's bad faith certificate had been made improvidently. Yet the court docketed the appeal and then dismissed it on the merits. I have difficulty in understanding that procedure: Unless the court granted leave to appeal *in forma pauperis*, I think it lacked power to excuse payment of the docket fee, and therefore lacked power to docket the appeal. That is, in order to docket the appeal, the court had to grant a *forma pauperis* appeal, regardless of the trial judge's bad faith certificate. If it did, then it should have ordered that the defendant be supplied with a transcript gratis.

Quite different is permission to file, followed by dismissal of the petition for leave to appeal *in forma pauperis;* cf. Higgins v. Steele, 8 Cir., 195 F.2d 366, 369.

**4a.** Under such a ruling, the defendant's situation resembles that of a person who sought to sue *in forma pauperis* in Eng-

land at a time when, to do so, he was obliged to obtain a lawyer's certificate that he had a good cause of action. This rule, says Maguire, is an illustration of a "vicious circle. An applicant comes to court for gratuitous legal services because he cannot beg or pay for a lawyer's services; he finds that he must beg or pay for a lawyer's services, before the court will hear him; and so his suit ends without ever beginning. * * * We find the needy suitor lifted from one horn of a dilemma only to be more firmly impaled on the other." Maguire, Poverty and Civil Litigation, 36 Harv.L.Rev. (1923) 361, 377, 380.

**5.** I say "usually" since there are some few cases where, absent a transcript, trial errors will be manifest—e. g., where an indictment on its face is wholly defective.

**5a.** I assume that, in determining whether the trial judge's certificate should be disregarded, the appellate court is to determine merely whether the appeal is frivolous, and that, in so determining, it will apply the same test as under Criminal Rule 46(a) (2) as recently amended, 18 U.S.C.A.

situation would be able to prove the trial judge's error.[6]

But such a result is not necessary: In the federal courts, a destitute defendant, to whom a transcript is not available, can obtain the equivalent, in the manner described in Miller v. U. S., 317 U.S. 192, 63 S.Ct. 187, 87 L.Ed. 179 and United States v. Sevilla, 2 Cir., 174 F.2d 879:[7]

If competently advised by counsel, the defendant will present to the trial judge a statement of the proceedings at the trial, "made up from the best sources available." The judge then will have the duty to assist in amplifying, correcting and perfecting that statement from the best sources available to him. To that end, the judge may and should interrogate the witnesses, the counsel who represented the government and the defendant at the trial, and any other persons having reliable information. Outstanding among such other persons is the official reporter who took stenographic notes during the trial. The judge may require the reporter to read to the judge from those notes.[8] However, in order to avoid so laborious a task, the judge may avail himself of 28 U.S.C.A. § 753(b) by directing the official reporter to transcribe the notes and, free of charge, deliver a transcript to the judge.[9]

With the statement (consisting of the transcript or otherwise prepared) approved by the trial judge, the upper court will be able to decide whether the judge's certificate of "bad faith" is justified. In that way the Griffin doctrine will be satisfied. In order, however, adequately to procure such a statement, and also adequately to point out in a petition to the upper court that (if it be a fact) the judge's certificate was mistaken, the ordinary indigent defendant will need the assistance of counsel. Without such lawyer-assistance, such a defendant will be at a marked disadvantage as compared with a non-indigent defendant. Accord-

6. My colleagues' opinion might conceivably be read to mean that, even in the absence of a transcript, the defendant may get around the trial judge's "bad faith" certificate by alleging, in his *forma pauperis* petition to the appellate court, serious trial errors, "with reasonable particularity." However, according to my colleagues' opinion in United States v. Farley, 238 F.2d 575, 576, also decided today the defendant in such circumstances would be in this position: The appellate court would allow the defendant to renew his application to the trial judge; if the judge again certified no "good faith," the upper court would be obliged to deny leave to appeal *in forma pauperis*, unless defendant showed that the certificate itself was " 'without warrant or not in good faith' "; but the appellate court and the district judge must deny defendant the sole means of so showing, i. e., a transcript or the equivalent.

7. See also United States v. Sheridan, 329 U.S. 379, 393, 67 S.Ct. 332, 91 L.Ed. 359; Helwig v. U. S., 327 U.S. 770, 66 S.Ct. 956, 90 L.Ed. 1000 and Id., 328 U.S. 820, 66 S.Ct. 1336, 90 L.Ed. 1601; cf. Griffin v. People of State of Illinois, 351 U.S. 12, 20, 76 S.Ct. 585 as to "bystanders' bills of exception."

8. See United States v. Sevilla, 2 Cir., 174 F.2d 879, 880 and note 4.

The following alternative suggestion might perhaps be approved by the Supreme Court: (1) After Wells v. U. S., 318 U.S. 257, 63 S.Ct. 582, the Supreme Court, in Roberts v. U. S. Dist. Court, 339 U.S. 844, 70 S.Ct. 954, 94 L.Ed. 1326 (citing Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 63 L.Ed. 1528), held that the denial by a district judge of a motion to appeal *in forma pauperis* is a final appealable order, under 28 U.S.C.A. § 1291. See also Adkins v. E. I. Du Pont De Nemours & Co., 335 U.S. 331, 69 S.Ct. 85, 93 L.Ed. 43. (2) In Wells, the Supreme Court in effect held that the district Judge's certificate of bad faith is reviewable. Coupling Wells and Roberts, it may be that the judge's action in issuing such a certificate is an appealable order. (3) If so, the defendant may appeal from that order. On defendant's making a showing of poverty, the appellate court could perhaps allow him to prosecute that appeal *in forma pauperis* under 28 U.S.C.A. § 1915(a). (4) Should it do so, the appellate court could direct that the defendant receive a transcript gratis under 28 U.S.C.A. § 753(f).

9. See United States v. Sevilla, 2 Cir., 174 F.2d 879, 880.

ingly, I think the Griffin doctrine requires that an indigent defendant have such legal assistance; I think the spirit of the Sixth Amendment, taken together with Criminal Rules 39(a) and 44, reinforces that requirement.[10]

In the instant case, defendant, who had had a court-appointed lawyer up to the time of his conviction, had none thereafter. His need for one is reflected in the crude character of his application *in forma pauperis*. In United States v. Sevilla, 2 Cir., 174 F.2d 879, we appointed a lawyer to aid the defendant in preparing a statement of the trial proceedings, although there the defendant, an alien, could not, under the statute, appeal *in forma pauperis*. A *fortiori*, here, where defendant is not an alien, we should appoint a lawyer to guide defendant (a) in procuring a statement of the trial proceedings and (b) in drafting and presenting to us a revised motion for relief *in forma pauperis*.[11]

I conclude then that, although we should now deny defendant's motion, we should do so with leave to file a revised motion after the defendant—with the aid of counsel designated by us to assist him—has obtained a statement of the proceedings at the trial; such counsel should also aid defendant in preparing and presenting the revised motion. We can then, on that basis, informedly consider whether to grant leave to appeal *in forma pauperis*.

2. Because of my colleagues' approach to the problem, I think it desirable to add the following:

(a) As my colleagues say, the courts should discourage frivolous appeals. However, judicial denials of *forma pauperis* appeals cannot discourage appeals by defendants who are financially well off; and the fact that a defendant—e. g., a wealthy professional criminal or a member of a wealthy criminal gang—can afford to pay for his appeal is no assurance that it is not frivolous. But let us arbitrarily assume, *arguendo*, that the appeals of poor men in prison are much more likely to be frivolous than those of the financially well-heeled.[12] Even so, the fact remains that usually, without a transcript or the equivalent, an appellate court cannot tell whether or not a particular poor man's appeal has substance. Here, then, is an apparent dilemma: In order to know whether to grant a *forma pauperis* appeal, which carries with it a right to a transcript supplied gratis, usually the upper court must have before it a transcript or its equivalent.

The way out of this apparent dilemma is to consult the interest of justice: Surely, even if but one out of a hundred attempted appeals by indigents has merit, justice compels the conclusion that that appeal shall be heard. It is no answer that so many appeals will result as to "crowd the docket." If so, more judges should be appointed. True, the

10. The Supreme Court has said that the accused "requires the guiding hand of counsel in every step of the proceedings against him." See Powell v. State of Alabama, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158; Johnson v. Zerbst, 304 U.S. 458, 463, 58 S.Ct. 1019, 82 L. Ed. 1461. See also Donnelly, Book Review of Beaney, The Right to Counsel in American Courts, 64 Yale L.J. 1089 (1955).

Criminal Rule 39(a) provides: "The supervision and control of the proceedings on appeal shall be in the appellate court from the time the notice of appeal is filed with its clerk, except as otherwise provided in these rules. The appellate court may at any time entertain a motion * * * for directions to the district court, or to modify or vacate any order made by the district court or by any judge in relation to the prosecution of the appeal * * *." Criminal Rule 44 provides: "If the defendant appears in court without counsel, the court shall * * * assign counsel to represent him at every stage of the proceeding unless he elects to proceed without counsel or is able to obtain counsel."

11. By appointing a lawyer for that limited purpose we would not, as yet, be deciding whether to grant defendant leave to appeal *in forma pauperis*.

12. It should be noted that an appellate court may summarily dispose of a frivolous appeal by one able to afford an appeal.

cost of running the government will somewhat increase. But I, for one, cannot sleep well if I think that, due to any judicial decisions in which I join, innocent destitute men may be behind bars solely because it will cost the government something to have their appeals considered.

The American Bar Foundation noted in 1955: "Although the right of counsel may be clearly expressed in law, the exercise of the right to counsel may be impaired substantially by the imposition of costs and fees. In some jurisdictions a defendant, without resources to provide for his own defense, may have a completely adequate defense, from preliminary hearing to final appeal, entirely free of costs or fees. In others, court costs, the cost of transcripts, * * * and the like may operate to deprive him of the opportunity which the law purports to give him." [12a] In the light of Griffin v. People of State of Illinois, I think (contrary to my colleagues) that the federal courts are not in the second category.

(b) The Griffin doctrine represents an important step forward in the direction of democratic justice. My colleagues, regarding it as a bold step, shudder away from applying that doctrine to a case like that at bar (indeed are reluctant to apply pre-Griffin decisions like United States v. Sevilla, supra).

Yet Griffin, splendid though it is, is not exceptionally bold. We still have a long way to go to fulfil what Chief Justice Warren has called our "mission" to achieve "equal justice under the law," [13] in respect of those afflicted with poverty.

In our federal courts, and in most state courts, there is no provision by which a poor man can get funds to pay for a pre-trial search for evidence which may be vital to his defense and without which he may be deprived of a truly fair trial. Furnishing him with a lawyer is not enough: The best lawyer in the world cannot competently defend an accused person if the lawyer cannot obtain existing evidence crucial to the defense, e. g., if the defendant cannot pay the fee of an investigator to find a pivotal missing witness or a necessary document, or that of an expert accountant or mining engineer or chemist.[14] It might, indeed, reasonably be argued that for the government to defray such expenses, which the indigent accused cannot meet, is essential to that assistance by counsel which the Sixth Amendment guarantees. Legal Aid has no money available for that purpose, nor, in most jurisdictions, does the Public Defender (if there is one). In such circumstances, if the government does not supply the funds, justice is denied the poor—and represents but an upper-bracket privilege.

Sixteen centuries ago, Lactantius wrote, "Nobody is poor unless he stands in need of justice." It should give us pause not only that Magna Carta forced the king to agree, "To no one will we sell, to no one will we refuse, * * * justice," but also that, in ancient pre-democratic days, many a Bill in Eyre or Bill in Chancery successfully asked the aid of the court because the petitioner was poor and needed help against a wealthy and powerful opponent.[14a] Surely our

---

**12a.** Am. Bar Foundation, The Administration of Criminal Justice in the United States (1955) 164.
See also Mayers, The American Legal System (1955) 144.

**13.** Warren, Chief Justice John Marshall: A Heritage of Freedom and Stability, 41 Am.Bar Assn. (1955) 1008, 1110.

**14.** The Am.Bar Assn. through its Special Committee on the Administration of Criminal Justice, proposed in 1953 to study the problem; see 39 Am.Bar Assn. J. 743 (1953).
See Bliss, Defense Detective, 47 J. of

L., Criminal Law, Criminology and Police Science (1956) 264 to the effect that in three California counties, and also in Chicago and in Memphis, Tennessee, the Public Defender employs investigators who, free of charge, assist indigent defendants charged with crime, to obtain evidence in preparing their defense; in some of those places, apparently such defendants are also supplied, gratis, with the services of expert witnesses.

**14a.** Consider the plight today of a destitute man prosecuted by a wealthy government.

democracy should follow and enlarge upon those examples. Most of our state constitutions, echoing Magna Carta, proclaim that "every person ought to obtain justice freely without being obliged to purchase it"; yet, as matters now stand, men are often "obliged to purchase justice" or go without it if they have not the wherewithal. Such are the coercions of poverty that a decent sensible lawyer may well advise an innocent man, too poor to obtain essential defense evidence, to bargain with the prosecutor to accept a plea of guilty to a lesser crime than that with which the defendant is charged.

For thirteen years, I have been calling attention to this problem and urging a solution.[14b] I was most agreeably surprised, therefore, to learn, just the other day, that in Scandinavia it has been the practice, for upwards of seventy years, not only to allow every accused a defense counsel of his choice at government expense, but to place the police department and the office of the prosecutor equally at the service of the defense and the prosecution; defense counsel may have these agencies, at government expense, make all necessary investigations, including searches for witnesses and documents and analyses by handwriting, medical or chemical experts; and the prosecution is responsible for producing at trial the witnesses called by the accused as well as all other evidence he wishes introduced—again at government expense.[14c]

The federal government and all the states in this country, the richest on the globe, will, I hope, soon emulate the less opulent Scandinavian countries. Pending the time when they do so, considerations of expense should not stand in the way of the far more modest undertaking which I think necessary in the instant case, i. e., governmental assistance to a poor man necessary to enable him, as well as a rich defendant, to appeal his conviction if his appeal is meritorious.[15] If my colleagues' decision, which denies such assistance, were compelled by the statute and the precedents, I would concur,[16] contenting myself with urging re-

For a résumé of the early history in England of procedural relief to the poor, and the early development of suits *in forma pauperis*, see, e. g., Maguire, Poverty and Civil Litigation, 36 Harv.L.Rev. (1923) 361, 363 ff.

**14b.** Frank, White Collar Justice, Sat. Ev. Post, July 17, 1943. See also Frank, Courts on Trial (1949) 94–99; Frank, Administration of Criminal Justice, 15 F.R.D. (1953) 95, 100–101.

**14c.** Norway: For general outline of procedure in this respect see Stang, Rettergangsmaaten i straffesaker, 186–196 (1951); see also Lov om rettergangsmaaten i straffesaker, 1 July 1887 Secs. 170, 292–305, particularly Sec. 294, for provisions in the Code of Criminal Procedure. Sweden: Sveriges Rikes Lag, R. 17, Rattergaangs Balk. Denmark: Lov om Rettens Pleie, 11 April 1916, Munch-Pettersen Ed.1946, Chapter 75.

In my article, White Collar Justice, supra, and in Courts on Trial, I have pointed out that a similar problem exists in civil litigation. In Scandinavia, the cost of civil litigation—including the cost of necessary pre-trial investigation—may be at government expense if the party otherwise would be unable to bear the expense involved in trial of the case without depriving himself and/or his family of reasonable items necessary for daily living. For provisions in the codes of civil procedure in the respective countries, see Lov om rettergangsmaaten for tvistemaal, 13 August 1915 Nr. 6 Sections 169, 170 (Norway); Lov om rettens pleje, 11 April 1916, Sections 330–332 (Denmark); Sveriges Rickes Lag (1935 Ed.), R. 14:8, Lag om fri rattegaang, 19 June 1919 Section 1–3 (Sweden).

The material in this footnote has been supplied by my law clerk, Walter Shuttleworth.

**15.** The expense to the federal government of supplying a transcript is by no means enormous; the official reporter receives a salary and adds to his income by selling transcripts to those who can pay for them. In return, he must supply, free, a transcript, if requested, to the judge and to the prosecutor, and also to a defendant who has leave to appeal *in forma pauperis*. It is perhaps arguable that, if the number of transcripts furnished such defendants increased substantially, the reporters would ask and receive increased salaries. The amount of such a possible increase is conjectural.

**16.** If the only obstacle consisted of pre-

form by legislation. I think, however, the statute and the precedents have no such compulsion but, on the contrary, authorize us to do justice (as above described).

Although the courts can do and have done something to protect the poor (or relatively poor) from the consequences of gross inequalities in economic bargaining power,[17] of course the courts cannot and should not try to do away with the effects of all or most economic differences. But they can and should wipe out all the litigious disadvantages of poverty whenever a man is charged with, or convicted of, a crime.

My colleagues seem to have a fear—of a sort often voiced in the past by other by other judges when liberalization of doctrines has been urged—that dire consequences will follow.[17a] So, when in 1731 an English Act was enacted providing that all judicial proceedings should be in English, "some wise men predicted it would ruin England, some still wiser men seized on minor inconven-

iences that resulted from it as quite sufficient to damm it, and succeeding generations wondered why it had not passed a century earlier." [18]

We would do well to listen carefully to these recent remarks of Lord Justice Denning: "But * * * when I see how the lawyers (of England and America) have withstood despotism and tyranny from without, I sometimes think that within the law they have not been as vigilant as they should. Freedom has on occasions been abused even within the law itself. * * * " [19] The decision in this case should not be one of those occasions. For a man is free only if, among other things, "he is not liable to be * * * imprisoned without redress under an equal and impartial law * * * Freedom is not something which has to be safeguarded, but rather something to be extended." [20] Freedom confined to the status quo cannot grow; and freedom which does not grow tends to wither. Danger to democratic freedom lurks in the sentiment, "Come weal, come woe, my status is quo." [21]

---

cedents, I would urge that *stare decisis* should receive scant respect with reference *to former decisions in criminal* cases adverse to the defendant. See concurring opinion in United States v. Scully, 2 Cir., 225 F.2d 113, 118–119.

17. For instance, in cases involving seamens' releases, peonage, economic duress, and some kinds of "contracts of adhesion."

17a. See, for a criticism of this attitude, the dissenting opinion of Mr. Justice Brennan (then Judge of the Supreme Court of New Jersey) in State v. Tune, 13 N.J. 203 at 227 ff. (1953).

18. Winfield, The Chief Sources of English Legal History (1925) 13.

19. Denning, The Price of Freedom: We Must Be Vigilant Within the Law, 41 Am.Bar Assn. J. (1955) 1011.

20. Hampshire, 5 Encounter (1955) 36, 37, 39.

21. In 1913, Elihu Root said: "No one * * * doubts that it is the proper function of government to secure justice. In a broad sense that is the chief thing for which government is organized. Nor can any one question that the highest obligation of government is to secure justice for those who, because they are poor and weak and friendless, find it hard to maintain their own rights." He added that "it is time to set our own house in order." Root, Foreword to Smith, Justice and The Poor (3d ed. 1924).