**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kenneth C. GORDON, Defendant-Appellant.**

**No. 11929.**

United States Court of Appeals Seventh Circuit.

Feb. 19, 1958.

178

George F. Callaghan and Anna R. Lavin, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., and John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before DUFFY, Chief Judge, FINNEGAN, SCHNACKENBERG, HASTINGS and PARKINSON, Circuit Judges.

PARKINSON, Circuit Judge.

A four-count indictment was returned by the 1950 Grand Jury for the Northern District of Illinois, Eastern Division, against Kenneth C. Gordon, Kenneth J. MacLeod and Albert Swartz. Counts 1 and 3 alleged that defendants unlawfully possessed goods stolen while being transported in interstate commerce, in violation of Title 18 U.S.C.A. § 659, and counts 2 and 4 that they caused the property described in counts 1 and 3 to be further transported in interstate commerce, in violation of Title 18 U.S.C.A. § 2314. Swartz died previous to trial. Gordon and MacLeod were found guilty by a jury on all counts, upon which judgment was entered by the court. On appeal, this court affirmed. United States v. Gordon, 7 Cir., 196 F.2d 886. The Supreme Court allowed certiorari and reversed. Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447.

Upon a second trial, MacLeod was acquitted on all counts, by a directed verdict as to counts 3 and 4, and by a jury verdict as to counts 1 and 2. Gordon was found guilty on all counts and sentenced

by the court to imprisonment for a period of seven years on each count, the sentences to be served concurrently. From this judgment Gordon appeals.

Defendant asserts and argues numerous errors as grounds for reversal. In abbreviated form, the issues thus raised are: (1) counts 1 and 3 of the indictment are void in the absence of an allegation as to the value of the stolen property alleged to have been possessed by defendants; (2) the proof is insufficient to sustain the jury verdict, particularly as to counts 2 and 4; (3) there is a fatal variance between the proof and the allegations of the indictment as to value and description of the property; (4) the court erred in its admission and rejection of testimony; (5) the court erred in denying defendant's challenge to the jury panel, based upon a distribution to the jurors of a "Handbook for Jurors"; (6) the court erred in failing to poll the jury regarding newspaper publicity, and (7) the court deprived defendant of his constitutional right to counsel.

In view of the conclusion which we have reached relative to a disposal of the case, we shall consider only those issues which we regard as decisive. In the interest of brevity, we refer to our opinion on the first appeal reported at 196 F.2d 886 as well as to that of the Supreme Court for a more detailed statement of facts than is necessary to make for our present purposes.

■ It was shown that Kodak film shipped by truck from Rochester, New York to Chicago, Illinois was stolen while in transit. A portion of this film was subsequently found in Detroit, Michigan, in the possession of one Marshall, or in the possession of persons who had received it from him. He was the government's principal witness in the present as well as in the previous trial. Marshall testified concerning two trips made from Detroit to Chicago in his car, accompanied by Swartz (named as a defendant but since deceased), on July 20 and July 27, 1950. On the occasion of these visits he contacted Gordon and MacLeod, from whom he procured certain film

which was stored in a garage jointly controlled by them. Both Gordon and MacLeod on one or both occasions assisted Marshall in loading the film into his car, which bore Michigan license plates. In this car the film on each occasion was transported by Marshall, accompanied by Swartz, from Chicago to Detroit. Defendant Gordon as a witness contradicted the testimony of Marshall on all material matters. We are not concerned, of course, with this conflicting testimony because in the present posture of the case, the proof must be considered in the light most favorable to the government. Moreover the record furnishes considerable corroboration for Marshall's testimony.

No question is raised as to the sufficiency of the proof relative to the interstate transportation of the film from Rochester, New York to Chicago, Illinois, that it was stolen while in transit, or as to its interstate transportation by Marshall from Chicago, Illinois to Detroit, Michigan on the two occasions mentioned. It is neither alleged nor claimed that either Gordon or the other named defendants stole the film. As already noted, 1 and 3 are possession counts, and 2 and 4, transportation counts. The former two counts allege that the defendants had possession of the film, with knowledge that it had been stolen. The latter two counts allege that the defendants did "knowingly transport and cause to be transported in interstate commerce" the merchandise described in counts 1 and 3.

In our opinion on the first appeal we found it unnecessary to decide the issue as to the sufficiency of counts 1 and 3, on the well recognized theory that the sentence, being general, was supported by counts 2 and 4. We have now reached the conclusion, for reasons subsequently stated, that the proof is insufficient to support the judgment on counts 2 and 4. Therefore, it becomes essential to consider defendant's attack on the sufficiency of counts 1 and 3.

■ Section 659, upon which these counts are predicated, provides so far as

here material that "Whoever &ast; &ast; &ast; has in his possession any such goods or chattels [previously stolen from an interstate shipment], knowing the same to have. been embezzled or stolen," shall be "fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such &ast; &ast; goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both." Title 18 U.S.C.A. § 1, entitled "Offenses classified," provides: "(1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony. (2) Any other offense is a misdemeanor." It is at once apparent that the statute under consideration describes two classes of offenses, dependent upon the value of the property, that is, a felony if the value exceeds $100, and a misdemeanor if the value does not so exceed. Neither count 1 nor count 3 contains any allegation, by reference or otherwise, as to the value of the property alleged to have been unlawfully possessed. Are the counts for this reason insufficient as a matter of law? We hold they are.

■ It is the universal rule, so far as we are aware, that "each count in an indictment is regarded as if it was a separate indictment." Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356; Walker v. United States, 9 Cir., 176 F.2d 796, 798; United States v. Denny, 7 Cir., 165 F.2d 668, 670; McClintock v. United States, 10 Cir., 60 F.2d 839, 840. It is true, of course, that one count may be aided by incorporating the allegations of another count by reference. Both the Walker and McClintock cases so hold. To the same effect, United States v. Taylor, 2 Cir., 207 F.2d 437, 438, with Supreme Court citations in support of the proposition.

We know of no Federal case where the precise issue has been decided. However, in Cartwright v. United States, 5 Cir., 146 F.2d 133, the court, in discussing the statutory distinction between a felony and a misdemeanor, stated (page 135):

"It is, therefore, well settled that where the grade of larceny, and consequently the punishment, depend on the value of the property, it is essential that the value of the property defendant is charged with having taken be alleged and proved, 32 Am. Jur., Sec. 112, p. 1023."

In Illinois, it is definitely settled that there must be both allegation and proof of value where the place of imprisonment, the length of sentence or the amount of fine is dependent thereon; further, that proof of value in the absence of an allegation is as futile as an allegation without proof. Brown v. People, 173 Ill. 34, 37, 50 N.E. 106; People v. Jackson, 312 Ill. 611, 612, 144 N.E. 314; People v. Swinson, 406 Ill. 233, 236, 92 N.E.2d 758.

■■ The government points to the fact that counts 2 and 4 incorporate by reference the goods set forth in counts 1 and 3, and allege a value of more than $5,000. This allegation, while an aid to counts 2 and 4 is of no aid to 1 and 3, which, as noted, contain no reference to counts 2 and 4. The government argues "that after reading the indictment in this case there could be no doubt in anyone's mind that the goods set forth in counts 1 and 3 were valued at more than $100." Assuming such to be true, the argument is beside the issue. Each count must be judged on its own allegations, either those made directly or by reference. To hold that an allegation of value is not essential would place both the accused and the court in an awkward, if not intolerable, situation. A defendant should not be expected or required to plead to a count without knowledge as to whether it charges a felony or a misdemeanor. A plea of guilty to such a count would leave the court in the dark as to whether to impose sentence for a felony or misdemeanor. The government argues that it does not follow from a failure to allege value that no offense was proved. This, if true, is immaterial. The issue is a failure to allege, not a failure to prove.

The government cites Tinder v. United States, 345 U.S. 565, 73 S.Ct. 911, 97 L.

Ed. 1250; United States v. Scarlata, 3 Cir., 214 F.2d 807, 809, and United States v. Marpes, 3 Cir., 198 F.2d 186. Both the Tinder and Scarlata cases involved proceedings under Title 28 U.S.C.A. § 2255, to vacate or correct sentences. It is not shown that any question as to the sufficiency of the indictments was raised or put in issue. In the Marpes case defendant was tried on two indictments, one of which failed to allege the value of the goods stolen. Again no question was raised as to the sufficiency of the indictment. The issue on review was whether the proof concerning value alleged in one of the indictments was sufficient. The most that can be said of these cases is that where a defendant raises no question as to the sufficiency of a count which fails to allege value and enters a plea of guilty or is convicted, such a count will sustain a judgment for a misdemeanor but not a felony. We think they are of no benefit to the government in the instant situation.

■ A serious challenge is made as to the sufficiency of the proof on counts 2 and 4, that is, those which allege transportation. It is not claimed and there is no proof that Gordon actually transported the film from Chicago to Detroit as alleged. As noted, the transportation was made in a car owned and driven by Marshall, accompanied by Swartz. Proof that Gordon assisted in loading the stolen film into Marshall's car is sufficient, so it is argued, to make him an aider and abetter in the commission of the offenses charged, and therefore, he was properly convicted as a principal. The government concedes that under this theory it was incumbent upon it to show that Gordon, at the time the film was loaded into Marshall's car, had knowledge that it was to be transported in interstate commerce. In fact, the government relies upon Anstess v. United States, 7 Cir., 22 F.2d 594, a decision of this court, wherein it was held that one who sells contraband whiskey to another with knowledge that the purchaser intends to transport it unlawfully participates in the purchaser's plan to transport. The court stated

(page 595): "One who, with full knowledge of the purpose with which contraband goods are to be used, furnishes those goods to another to so use them, actively participates in the scheme or plan to so use them."

The factual basis upon which the government relies in support of the sufficiency of the proof is stated in its brief as follows:

"From the possession and furtive manner of disposition of this film the jury was justified in inferring that the defendant Gordon knew the film to have been stolen and that having known Swartz for a number of years, that he was in the jewelry business in Detroit, and he had done business with him on a number of occasions and that on two occasions he assisted loading the stolen film into the car bearing Michigan license plates, they were also justified in inferring that he knew where the film was going."

Even this statement is more favorable to the government than the record justifies. "Bold" would be more accurate than "furtive," inasmuch as the film was disposed of in broad daylight, in a thickly populated area of Chicago. Defendant asserts that there is no proof, and we find none, that he had knowledge that Swartz was in the jewelry business in Detroit, or that he had done business with him on numerous occasions. There is no proof that defendant saw or had knowledge that the car in which the film was placed bore Michigan license plates. The government's statement is loaded with inferences. The jury was required to infer that defendant had knowledge that the film had theretofore been stolen, infer that he had knowledge that the car bore Michigan license plates, and further infer that he had knowledge that the film was to be transported by Marshall and Swartz from Chicago to Detroit.

In our view, the assertion that defendant had such knowledge can rest on nothing more than a strong suspicion. The record indicates that after the film was loaded into the car, defendant had no fur-

ther interest therein, or in the proceeds to be derived therefrom. Such being the case, what difference could it have made to Gordon whether the film was transported by Marshall and Swartz to some other location in the city of Chicago, or to some other point in Illinois, such as Peoria or Cairo? It is not shown how transportation of the film to Detroit was of any benefit to or concern of defendant.

The government in its brief suggests: "What would be more natural than to get it [the film] away from the place of theft, where the law enforcement officers would be searching for it, and have it disposed of in some distant market, such as Detroit." The argument is not impressive. We cannot assume that Gordon or any of the parties involved had reason to believe that the law enforcement officers of Detroit were any less vigilant than those of Chicago.

A conviction of causing stolen property to be transported in interstate commerce may depend upon the character of the transaction. Illustrative is Pereira v. United States, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435, and United States v. Sheridan, 329 U.S. 379, 391, 67 S.Ct. 332, 91 L.Ed. 359. In those cases, defendants cashed worthless checks drawn on banks located in other states. The court held that this was sufficient proof of causing transportation, on the ground that the defendants had knowledge at the time they cashed the checks that they would be sent for collection across state lines to the banks upon which they were drawn. This knowledge was imputable to the defendants because they knew there was no other place the checks could be sent. In contrast, no such knowledge is imputable to defendant in the instant case because the point of destination could have been one place as well as another, and was a matter of indifference to defendant.

The court instructed the jury, and properly we think:

"In order to justify a jury in finding a verdict of guilty based on circumstantial evidence, the circumstances must not only be consistent with the guilt of the defendant, but they must be inconsistent with any other reasonable hypothesis that can be predicated on the evidence; or, stated in another form, it is not sufficient that the circumstances proved coincide with, account for, and therefore render probable the hypothesis of guilt asserted by the prosecution, but they must exclude to a moral certainty and beyond a reasonable doubt, every other hypothesis but the single one of guilt, or the jury must find the defendant not guilty."

If the jury had followed this instruction, the conclusion is inescapable that defendant was entitled to a verdict of acquittal on the counts under discussion. Certainly the proof does not exclude to a moral certainty the hypothesis that the transportation of the film by Marshall and Swartz was a matter of indifference to defendant and that he had no concern with or knowledge of the place of its destination. We hold the proof insufficient to sustain a conviction on counts 2 and 4.

█ We think we should not pass unnoticed one phase of defendant's contention that he was deprived of a fair trial because of the admission of incompetent testimony. The witness Booth testified, over objection, to a statement made to him by MacLeod in April 1952, and the witness McCormick, also over an objection, testified as to a conversation with MacLeod in June 1952. (These conversations took place almost two years after the commission of the alleged crimes and subsequent to the reversal of the previous conviction.) Both statements by MacLeod were made to these witnesses out of the presence of Gordon. They were admitted only against MacLeod, with the usual cautionary instruction by the court that they were not to be considered against Gordon. The important portion of MacLeod's statement as related by Booth is as follows:

"Kenneth Gordon was mixed up in some stolen film at that time that had been stored in the rear of the:

garage at 217, and that he had * * Kenneth Gordon had stolen this * * * or had gotten the film from some thief and had stored it at the back of the garage at 217 East Erie, and that he hadn't made anything out of the deal, and that he had * * * they had got caught with it. * * * Gordon * * * I mean, that the deal was that he said Gordon was supposed to send fellows over with cars and he was supposed to help load it in the cars for a percentage of the profit, and they got caught and there was no profit in it for him."

MacLeod's statement as testified to by McCormick is as follows:

"He [MacLeod] said first he had not stolen the films, that the film had been obtained by Gordon from the people who stole it. * * * He said that he had had nothing to do with the theft of the film; that the first he knew about it was when Gordon had brought it to 215 East Erie Street; that he didn't want the film there in the first place, but that he and Gordon were in partnership at that time in the roominghouse and there wasn't much he could do about it. He also said that Gordon told him they would make some money on it."

It is evident that this testimony could not have been other than damaging and prejudicial to Gordon. The government justifies its admission, however, on the premise that it represented incriminating admissions by defendant MacLeod and that the court's cautionary instructions sufficiently protected Gordon. Numerous cases are cited which have embraced the fanciful theory that any damage done to Gordon was cured by the court's admonition to the jury. While the courts still cling to the theory, there is a growing tendency to repudiate it, and we think the sooner this is done, the better. As the late Justice Jackson stated in his concurring opinion in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790, "The

naive assumption that prejudicial effects can be overcome by instructions to the jury [citing case], all practicing lawyers know to be unmitigated fiction."

A similar issue was before the Supreme Court in Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L. Ed.2d 278, wherein a judgment of conviction was affirmed by a five to four decision. The majority reasoned that the cautionary instructions of the court were sufficient under the circumstances of that case to safeguard the rights of a co-defendant. The circumstances of the instant case, as we shall point out, are different and observations made by the dissenting members of the court in Paoli are pertinent. The dissent states (352 U.S. at page 247, 77 S.Ct. at page 302): "The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors." And again (352 U.S. at page 248, 77 S.Ct. at page 303): "The Government should not have the windfall of having the jury be influenced by evidence against a defendant which, as a matter of law, they should not consider but which they cannot put out of their minds."

The circumstances of the instant case are different in at least one important respect, that is, it is doubtful if the testimony under discussion can be properly characterized as incriminating admissions by MacLeod; in fact, they are exculpatory rather than incriminating. It is not discernible how these statements could have been of any material aid to the government's case against MacLeod. At the same time, they were, as to Gordon, deadly poison. It is not surprising that the jury convicted Gordon and acquitted MacLeod. That the damaging effect of this testimony was cured by the cautionary instructions ignores realities and is contrary to all logic and common sense. Its admission on the flimsy pretext for which it was offered was of such a prejudicial nature as to require a reversal.

The foregoing is and was, by our opinion of July 16, 1957, dispositive of this case on appeal. However, we then went on to say that although there was no necessity for considering other errors relied upon by the defendant we felt constrained to make an exception and consider defendant's challenge to the venire. The defendant had filed a written challenge to the entire panel of petit jurors in the District Court upon the grounds that they had been furnished with a pamphlet entitled "Handbook for Jurors" by either the Clerk or Deputy Marshal; that such handbook had improperly indoctrinated them so that they could not fairly and impartially sit as jurors in this case; that the handbook contained erroneous and misleading statements "the reading of which would so influence a prospective juror that he could not give to the defendants a fair and impartial trial" and the distribution thereof deprived the defendant of due process of law.

The only evidence offered by the defendant in an attempt to prove those allegations was the testimony of one Margaret Mulane, the person to whom the petit jurors report at the commencement of their service, that she gave a copy of the handbook to each of the prospective jurors and told them it was "a nice jury book and they should read it" but that she did not know whether they did read it or not.

The Government having made no issue as to whether the question was properly raised by a challenge to the venire we, upon the record that the challenge as made was *admittedly* sufficient to preserve the question for review, gave minute and careful consideration to the contents of the handbook and held that it was prejudicial and that the challenge should have been sustained.

The Government then filed a petition for rehearing *en banc* pertaining solely to the handbook portion of our opinion specifically contending that a challenge to the array does not properly raise the question. We granted the petition and, sitting *en banc*, reheard the handbook issue.

■ That it is too late to present a question for the first time on a petition for rehearing is so well settled that citation of authority would be superfluous. However, under the circumstances of a reversal of the cause for the reasons heretofore stated, to ignore the failure of the challenge to the venire to properly raise the handbook question would extend the office of such a challenge clearly beyond all proper limits and permit the addition of a ground not heretofore recognized by the law and for which there is no justifiable reason whatsoever. This we must not do.

■ A challenge to the array or, as entitled in some jurisdictions, a challenge to the venire is of common law origin. It was based on some partiality or default of the sheriff or his under officer and, as it was the duty of the sheriff to summon the jury, this was the only ground for such challenge. Chitty's Criminal Law, Fifth American Edition, Vol. I, pages 535(a) to 539; Cooley's Blackstone, Third Edition, Vol. II, pages 357 to 359. It goes to the form and manner of making up the whole panel and relates to the legality of drawing, selecting or impaneling the array. Whippany Paperboard Co., Inc. v. Local No. 301, 1952, 11 N.J. 153, 93 A.2d 349, 357. It can only lie when there is partiality or misconduct of the sheriff or some irregularity in making out the list, State v. Levy, 1924, 187 N.C. 581, 122 S.E. 386, 388; State v. Kirksey, 1947, 227 N.C. 445, 42 S.E.2d 613, 614, and will only be allowed upon some ground affecting the validity of the whole panel growing out of the proceedings in selecting and summoning the jurors composing the panel. State v. Smith, 1951, 138 Conn. 196, 82 A.2d 816, 820. It is universal and well established law that, absent statutory enactment, a challenge to the array or venire can only raise the question of the invalidity of the entire panel because of some vitiating defect or irregularity in the selection or summoning of the jurors. Am.Jur. Vol. 31, Jury § 112, page 640, 50 C.J.S. Juries § 262, p. 1021.

■ The challenge of the defendant Gordon raised no question whatsoever as

to the drawing, selecting or impaneling the array or venire nor was it grounded upon any charge of partiality or default of the officer who selected or summoned the panel. Moreover, the grounds of the challenge, even if sufficient to properly present the issue, were not supported by sufficient proof. The only evidence offered by the defendant was that the handbooks were distributed to the prospective jurors with a suggestion that they be read. The record is completely devoid of any evidence that any of the members of the jury read the handbook or had any information as to its contents or, if read, would have been influenced thereby against the defendant. It was incumbent upon the defendant to introduce, or to offer, distinct evidence in support of the challenge and the failure to prove his contentions was fatal. Glasser v. U. S., 1942, 315 U.S. 60, 87, 62 S.Ct. 457, 86 L.Ed. 680.

▮▮▮▮ Assuming, *arguendo*, that the entire panel read the handbook and that the handbook did contain statements inimical to a defendant in a criminal case, the defendant had the right of challenge to the polls. On *voir dire* examination he had the right, unless he desired to waive it, and it was his duty, to ascertain the true facts. In the event any member had read the handbook and for that reason could not give him a fair and impartial trial he had the right to challenge the juror for cause. Failure of the court to sustain such a proper challenge would constitute reversible error and defendant's right to a fair and impartial trial would be preserved. Under the law he could assert that right in no other manner.

In the case of Frazier v. U. S., 1948, 335 U.S. 497, 69 S.Ct. 201, 93 L.Ed. 187, the Supreme Court of the United States held that the jurors had to be examined individually for actual bias or prejudice resulting from their employment. This is the procedure that must be followed when the panel has been legally and properly selected, drawn and summoned without favor. In the absence of a challenge to the polls for cause, if interroga-tion on *voir dire* revealed any juror was disqualified because he was biased or prejudiced against the defendant by reading the handbook, the defendant cannot complain. He has waived that right.

The District Court was correct in overruling the defendant's challenge to the venire.

Judgment reversed and cause remanded.

Our former opinion of July 16, 1957 is superseded hereby and is withdrawn.

DUFFY, Chief Judge (concurring).

I concur in the opinion which Judge PARKINSON prepared after this Court again considered the issues in this case by holding a rehearing *en banc*. I am pleased that what we said in our former opinion with reference to "Handbook for Jurors" is no longer a part of the opinion of this Court, first, because I am strongly of the view that an erroneous conclusion was reached, and secondly, our previous opinion stated, in effect, that the discussion as to the handbook was *dicta*. In that opinion before discussing the Jurors' Handbook, we said: "In view of what we have held, there appears no necessity for considering other errors relied upon by defendants."

I was not a member of the division or panel which originally heard this case. Nevertheless, I would be entirely willing to forego an expression of my views on the Jurors' Handbook were it not for an opinion filed herein by Judge Finnegan. I ignore the charge that the majority of the Court relies upon a "flimsy archaic technicality" as being incorrect and as adding no light on any issues under discussion.

Judge Finnegan has quoted *in extenso* from our former opinion which has now been superseded and withdrawn. It is anomalous to be arguing about an opinion which is no longer the opinion of the Court. Nevertheless, it seems important to indicate that some of the members of this Court are not in agreement with the portions of the former opinion which Judge Finnegan has set forth in his sep-

arate opinion which he labels "dissenting in part."

In our previous opinion we stated: "While, as noted, we think the distribution of the handbook was prejudicial to defendant, a more important objection is that its use constituted an impingement upon the jury system, as well as an invasion of the prerogatives of the legislative branch of the government charged with the responsibility of providing qualifications for jurors." I have read and reread the pamphlet, and I can find no reasonable basis for saying the use of the booklet was an impingement upon the jury system or an invasion of the prerogatives of the legislative branch of the government. Such a statement should not go unchallenged.

In our previous opinion we also stated: "So, in the instant situation the distribution of the handbook was a departure from the statutory scheme, and the question for consideration is its effect on the jury system rather than a showing of prejudice in an individual case." I can see nothing about the distribution of the handbook which is a departure from the statutory scheme. Furthermore, I do not agree that the question for consideration is the effect on the jury system rather than a showing of prejudice to the defendant in the case at bar.

We also stated in our previous opinion: "In our view, the most serious criticism of the pamphlet as a means of conveying information is that which is omitted rather than that which is stated." I take it the Committee of Judges which prepared the pamphlet and the Judicial Conference of the United States which gave its approval never intended the booklet to be a complete exposition of rules that might apply to a civil or to a criminal case. The booklet was not intended to be an all-inclusive treatise upon the criminal and civil law.

Prior to 1941, many learned and experienced trial judges realized that the proper administration of the law in federal courts would be aided if jurors had some general information as to the role they were supposed to play in the dispensing of justice in those courts. It was undoubtedly the belief of many judges that an informed juror who understood something of the proper functions of a juror could do a better and more intelligent job than one who went into the jury box with a blank mind and with none but the vaguest ideas of where a juror fitted into the federal judicial picture.

In 1941, the Judicial Conference of the United States, then known as the Judicial Conference of Senior Circuit Judges, authorized Chief Justice Harlan Stone to appoint a committee of five district judges to make a study, with recommendations, of the manner of selecting jurors in federal courts. One of the members selected was our late colleague, Honorable Walter C. Lindley, whom the writer of this opinion regards as having been one of the ablest and most experienced trial judges in the country. The other four judges selected were also of wide trial experience. They were Judge John C. Knox of the Southern District of New York; Judge James M. Proctor of the District of Columbia; Judge Colin Neblet of the District of New Mexico; and Judge Harry E. Watkins of the Northern and Southern Districts of West Virginia. It will be noted that this committee represented a splendid cross section of all federal trial judges, for they had wide experience in trying jury cases in both urban and rural areas. It was this committee which drafted the handbook for jurors and before submitting same to the Judicial Conference, caused it to be circulated among all federal judges in the country inviting suggestions and criticisms. After further consideration, the committee made its report and submitted the handbook to the Judicial Conference which approved the handbook and authorized its distribution. From time to time certain modifications and improvements were suggested, and in 1953 the committee recommended certain amendments. In 1954 a letter was sent to all federal judges enclosing the proposed revision and asking for further comments. The handbook

was then submitted to the Judicial Conference which approved same and authorized the Administrative Office to have it printed and distributed. The revised version was shorter and more attractively printed than the original draft.

The handbook for jurors has been widely used in federal trial courts throughout the country. Many states thereafter adopted handbooks for jurors to be used in the courts of such states. The American Bar Association through its section of Judicial Administration, is now working on a handbook for grand jurors. It was apparent that the purpose of the handbook was not to be an exposition or treatise of the principles of civil and criminal law, but rather, in the language of Judge Ruby M. Hulen, in an article in the American Bar Journal of October, 1952, page 815: " * * * to tell jurors something about their work, its importance, how it should be approached and performed, along with the fundamentals of Court terms and procedure."

The proper functioning of the jury system in our courts is of tremendous importance. Many times a citizen is called for jury service who has had no previous jury experience. All too often he is resentful because he thinks he is faced with an unpleasant chore at relatively small pay which will interfere with other duties and activities. His mental attitude towards his jury service is not good. However, a reading of the handbook here in question would show how a jury can be the guardian of the rights of a free people; it emphasizes the idea that a juror occupies a position of great dignity and importance. The juror is told, in effect, that he is an officer of the court, and that it is the juror's function to find the facts just as it is the judge's function to determine the applicable law.

A reading of the handbook clearly discloses it is a broad orientation of jurors without reference to any specific lawsuit. It contains fundamental information concerning the operation of the federal jury system.

The following excerpts from the handbook are illustrative as to the purpose of the pamphlet:

(a) "The judge determines the law to be applied in the case while the jury decides the facts."

(b) "The law is what the judge declares the law to be."

(c) "The verdict is reached without regard to what may be the opinion of the judge as to the facts, though as to the law his charge controls."

(d) "The jury in a criminal case must determine what are the true facts and the judge tells the jury what is the law."

(e) "In both civil and criminal cases, it is the jury's duty to decide the facts in accordance with the principles of law laid down by the judge in his charge to the jury."

(f) "Each juror should give close attention to the testimony. He is sworn to discard his prejudices and follow the court's instructions."

(g) "They violate their oath if they render their decision on the basis of the effect their verdict may have on other situations."

The previous opinion of this Court treats the handbook as though it were an instruction to the jury in the case at bar. However, the court below instructed as follows: "You are now further instructed that you shall decide this case only upon the evidence received here in open Court, under the instructions of the Court which are now being given you." Also, "If you have heard or read or observed anything concerning this case otherwise than here in open Court, you are instructed wholly to disregard what you have so heard, read or seen, and to decide this case solely upon the evidence produced here in open Court under the instructions now being given to you."

But, conceding *arguendo*, that in some manner the handbook could be considered as instructions in the instant case, there is no justification for taking words

or sentences out of context. The excised sentences or words must be read as part of the entire charge. United States v. De Marie, 7 Cir., 226 F.2d 783, 787; United States v. Phillips, 7 Cir., 217 F.2d 435, 443; United States v. Wicoff, 7 Cir., 187 F.2d 886, 890.

Considering the handbook as a whole, there is no basis for claiming that it contained prejudicial error in the case at bar. Instead, the impression upon a prospective juror's mind is likely to be that described by Chief Justice Harlan F. Stone when, under date of September 1, 1943, he wrote a "Foreword" in the handbook as follows: "This handbook describes in language readily understood the functions of the juryman in the Federal courts. Every prospective juror should read and reflect upon its advice and resolve by following it, to make his own contribution to the better administration of justice. Many will, I believe, be surprised and gratified to learn that that contribution can be far greater than they had supposed."

Judge Finnegan has added something new. He discovered the Judicial Conference of the United States was acting beyond its authority in authorizing the publication and distribution of the Handbook for Jurors. It is difficult to believe this contention is seriously made. Yet, as I understand his opinion, he has concluded that an Act of Congress was necessary to authorize the publication and distribution of the handbook.

During the period when the handbook was published and distributed, the Chief Justice of the United States had been directed by Congress to summon to an annual meeting the Chief Judge of each Judicial Circuit in the country. The Chief Justice was directed to preside at the meeting of the group which was designated as the Judicial Conference of the United States. Title 28 U.S.C.A. § 331. The Conference was specifically directed to make a comprehensive survey of the business of the courts of the United States, and to submit suggestions to the various courts in the interest of uniformity and expedition of business. The Chief Judge of each Circuit was directed to report to the Conference as to the needs of his Circuit and as to any matters in respect of which the administration of justice in the courts of the United States could be improved. It is thus apparent that Congress expected the Judicial Conference to consider proposals which might improve the administration of justice in the federal courts.

When Congress provided for a Director of the Administrative Office of the United States Courts, it outlined many of his duties. Title 28 U.S.C.A. § 604 provided: "The Director shall be the administrative officer of the courts, *and under the supervision and direction of the Judicial Conference of the United States shall * * *.*" Paragraph 12 of the directions provided that the Director shall "perform such other duties as may be assigned to him by the Supreme Court *or the Judicial Conference of the United States.*" Hence, it appears without doubt that the Judicial Conference acted within its powers in approving the report of one of its committees, which had been appointed by the Chief Justice, and in authorizing the Administrative Office to publish and distribute the booklet "Handbook for Jurors." Each district judge who received the booklet was advised and understood that it was optional with him whether the booklet was to be used in his court.

HASTINGS, Circuit Judge.

I concur in the opinion prepared by Judge PARKINSON and I also concur in the separate concurring opinion by Chief Judge DUFFY.

FINNEGAN, Circuit Judge (dissenting in part).

Our order entered October 23, 1957 granting the government's petition for rehearing *en banc,* delineated the issue for reconsideration. But our opinion handed down July 16, 1957 (U. S. v. Gordon) has been rewritten and for that reason I must report my position on the total case. While joining in the second reversal and remandment, I disapprove all that part of the opinion on rehearing

discussing the "Handbook For Jurors" and through which all views expressed by the initial panel, of which I was a member, regarding that now troublesome pamphlet, have been deleted. It is singular to note how late in the day my brothers would unearth a flimsy archaic technicality as their warrant for glossing over what three judges of our Court originally thought was, an impingement "upon the right of a defendant to a fair and impartial trial as guaranteed by the Constitution and the law, as we think it does * * *" It must be remembered that Judge Major, speaking for a unanimous panel, also said in the first Gordon opinion: "The challenge to the venire, *admittedly* sufficient to preserve the question for review, was based upon the distribution to the jurors of a 14-page pamphlet * * *" (Emphasis added.) If it is necessary to play with the common law concepts of the defense motion, despite the Government's waiver and second thought plea, then I would invoke Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A., and notice the plain "errors or defects affecting substantial rights" stimulated by indoctrinating jurors by means of the Handbook.

The present divergence of views expressed by my brothers ought to be examined against the following passages authored by Judge Major as part of his appraisal of the Handbook:

"Defendant criticizes either as erroneous or misleading many of the statements contained in the handbook, a detailed discussion of which would unduly prolong this opinion. In our view, the most serious criticism of the pamphlet as a means of conveying information is that which is omitted rather than that which is stated. The pamphlet purports to inform the juror as to the procedure and rights of the parties in a civil case and, distinct therefrom, the procedure and rights of the parties in a criminal case. Referring to a civil case, a juror is informed that 'Defendant calls witnesses and produces evidence, to disprove the plaintiff's case and to prove the defendant's claims.' That is an inaccurate statement as applied to a civil case where a defendant is accorded the privilege but not required to produce evidence. The damaging effect which this misinformation is likely to produce is amplified by the statement, 'The procedure in a criminal case in a United States District Court is very similar in many respects to that in a civil case except that the United States government always begins the case.' And again, 'What has been said in this handbook about the procedure in civil cases applies in a general way to criminal trials.' We think this anemic distinction between a criminal and a civil case was likely to implant in the mind of a juror an erroneous impression, particularly so when the pamphlet makes no reference to the numerous safeguards provided by the Constitution and otherwise for the protection of a defendant in a criminal case. In no manner was a juror informed that a defendant charged with crime is entitled to the presumption of innocence and that the burden of proving his guilt beyond a reasonable doubt is upon the government. The pamphlet states, 'The defendant has a right to present his evidence at the trial in open court before the judge and the petit jury.' The juror was not informed that a defendant is not required to present any evidence, or that a defendant may, at his option, become a witness and that no inference is to be indulged against him for his failure so to do.

"The pamphlet states, 'What sentence may be given the defendant must be of no concern to the jury. Sentencing is the function of the judge alone.' We assume that is substantially a correct statement of law; in fact, the court in the instant case instructed the jury to that effect. However, following the last

quotation the pamphlet proceeds: 'A verdict of guilty does not necessarily mean that the defendant will receive a long sentence or that he will be required to serve any sentence at all. The judge may impose such sentence as appears to him to be just with the limits fixed by law or in a proper case he may suspend sentence and place the defendant on probation.'

"We think an instruction in the language of this last quotation would have constituted reversible error. It amounts to a plain invitation to the jury to return a verdict of guilty and leave the consequences to the court. The information thus possessed by a juror could form the basis for a potent argument to win over a doubtful or wavering juror. It could prejudice the right of a defendant to a fair trial on the issue of his guilt or innocence.

"While there are other matters contained in the handbook which are of doubtful propriety, we think what we have shown is sufficient for our present purpose.

"We are not impressed with the government's argument that any misinformation imparted to the jury by means of the handbook is immaterial because, in any event, the jury was obliged to accept and apply the law as given to it by the court in its instructions. At any rate, it strikes us as a strange philosophy that a juror after he has been called for service can be officially indoctrinated with misleading and inaccurate information on the premise that in the end he will by the court's instructions be properly informed. Neither do we think there is any similarity between the situation where a citizen after he has been selected for jury service is furnished official information with judicial sanction, and a situation where a citizen receives information available to all from a non-official source. After a juror has

been selected it is too late to tutor him so that he will become more competent.

"While, as noted, we think the distribution of the handbook was prejudicial to defendant, a more important objection is that its use constituted an impingement upon the jury system, as well as an invasion of the prerogatives of the legislative branch of the government charged with the responsibility of providing qualifications for jurors. This Congress has done. See Title 28 U.S.C.A. § 1861 et seq.

" * * * in the instant situation the distribution of the handbook was a departure from the statutory scheme, and the question for consideration is its effect on the jury system rather than a showing of prejudice in an individual case. * *

"With reluctance we reach the conclusion that the challenge to the venire should have been sustained. We say with reluctance because of our recognition of the able and distinguished members of the Federal judiciary who authored the handbook, whose good purpose and laudable motive is not open to question. If its use impinges upon the right of a defendant to a fair and impartial trial as guaranteed by the Constitution and the law, as we think it does, it cannot be judicially sanctioned because of the noble purpose of its sponsors."

One embarks on an utterly futile pursuit when searching for any Act of Congress authorizing publication and distribution of the Handbook by the Judicial Conference of the United States. Certainly the precatory words found in 28 U.S.C.A. § 331 are unavailing, yet on the cover of the book under the great seal of the United States appears the wording: "Handbook For Jurors serving in the United States District Courts —Published by *Authorization* of the Judicial Conference of the United States." (Italics added.) Only recently, January 14, 1958, the Administrative Director of

the United States Courts transmitted bills, since sent Congress, asking legislative action to empower the Judicial Conference "to study and recommend changes in and additions to the rules of practice and procedure in the federal courts." I would think it pretty clear that at this moment the Conference cannot go beyond issuing recommendations and suggestions. See 28 U.S.C.A. § 331, as amended, 62 Stat. 902, 70 Stat. 497, 71 Stat. 476. I am well aware that some of my respected colleagues participated in the preparation of the Handbook, and yet, regretfully, I must express my views as a fellow judge. For we are living in times when signs, symbols and tokens are the order of the day and "hidden persuaders" exert desired responses among the unthinking and uneducated laymen. Jurors so ill-equipped that they need this Handbook will be prey to the errors in it. Judge Major saw the Handbook's pitfalls and described its incomplete statements in his opinion, now emasculated.

All of this goes even deeper for I think any process utilized for educating, orientating, and informing jurors of their duties requires Congressional authorization and manifestation of policy. An accused has a constitutional right to trial by jury and this does not mean by jurors especially and incompletely conditioned for duty as such. The inescapable presence of the actual issue of the handbook brought those of us on the first panel to grips with the problem. Examination of the first brief filed for Gordon shows his point: "IV Distribution of the handbook impinged upon the defendant's right to trial by jury. The challenge to the panel should have been sustained." Indeed, when responding the Government, without mentioning the defense motion, proceeded to a bland explanation of the handbook's admirable attributes. To now read out of Judge Major's opinion all unpleasant passages bearing on this handbook by attributing to him the inconsistency of first labeling his own efforts as dicta while he calmly and diligently expanded such material, is undeserved. Implicit in all of this, of course, is the notion that we who joined him, followed him in that tangential excursion. Obviously the holding was not dicta, nor can an isolated sentence extirpated from context produce such conversion, for Judge Major simply treated with an alternative ground of decision. See e. g. Woods v. Interstate Realty Co., 1949, 337 U.S. 535, 537, 69 S.Ct. 1235, 93 L.Ed. 1524; State ex rel. Foster v. Naftalin, 1946, 246 Minn. 181, 74 N.W.2d 249, 266; State ex rel. Lemon v. Langlie, 1954, 45 Wash.2d 82, 273 P.2d 464, 468. The point was before the court in the beginning and found firm basis in the record. That the handbook material was not dicta is also substantiated by the manifest urgency, evident in the second opinion, for undercutting the defense motion. That motion had to be devitalized in order to hurdle the government's failure to raise the point which led, not to dicta, but an alternate ground of decision.

SCHNACKENBERG, Circuit Judge (concurring in part and dissenting in part).

The most important part of this case has to do with the challenge of defendant to the use of the so-called handbook for jurors. The importance of the question in regard thereto, which was properly raised, argued and decided by the panel which heard this appeal originally, makes the matter of interest to all courts in the United States, including the federal district courts.

The unanimous opinion of the panel was written by retired Circuit Judge Major, a former chief judge of this court, with a background of distinguished service as a practicing lawyer, prosecuting attorney and United States district judge.

Responding to a direct attack upon the use of the juror's handbook and a defense of its use offered by the government attorney, Judge Major (who unfortunately cannot sit upon this court as a member of an *en banc* hearing, be-

cause he is now retired),[1] wrote an excellent opinion in which he reviewed the pertinent decisions and concluded that the use of the handbook "impinges upon the right of a defendant to a fair and impartial trial as guaranteed by the Constitution and the law," and "it cannot be judicially sanctioned because of the noble purpose of its sponsors." He pointed out that the government had in no way questioned the propriety of the challenge-to-the-array made by defendant at the trial in the district court, and which, as Judge Major said, was "*admittedly* sufficient to preserve the question for review".

Speaking of the contents of the handbook, Judge Major said, in part,

" * * * In our view, the most serious criticism of the pamphlet as a means of conveying information is that which is omitted rather than that which is stated. The pamphlet purports to inform the juror as to the procedure and rights of the parties in a civil case and, distinct therefrom, the procedure and rights of the parties in a criminal case. Referring to a civil case, a juror is informed that 'Defendant calls witnesses and produces evidence, to disprove the plaintiff's case and to prove the defendant's claims.' That is an inaccurate statement as applied to a civil case where a defendant is accorded the privilege but not required to produce evidence. The damaging effect which this misinformation is likely to produce is amplified by the statement, "The procedure in a criminal case in a United States District Court is very similar in many respects to that in a civil case except that the United States government always begins the case.' And again, 'What has been said in this handbook about the procedure in civil cases applies in a general way to criminal trials.' We think this anemic distinction between a criminal and a civil case

was likely to implant in the mind of a juror an erroneous impression, particularly so when the pamphlet makes no reference to the numerous safeguards provided by the Constitution and otherwise for the protection of a defendant in a criminal case. In no manner was a juror informed that a defendant charged with crime is entitled to the presumption of innocence and that the burden of proving his guilt beyond a reasonable doubt is upon the government. The pamphlet states, 'The defendant has a right to present his evidence at the trial in open court before the judge and the *petit jury.*' The juror was not informed that a defendant is not required to present any evidence, or that a defendant may, at his option, become a witness and that no inference is to be indulged against him for his failure so to do.

"The pamphlet states, 'What sentence may be given the defendant must be of *no concern* to the jury. Sentencing is the function of the judge alone.' We assume that is substantially a correct statement of law; in fact, the court in the instant case instructed the jury to that effect. However, following the last quotation the pamphlet proceeds: 'A verdict of guilty does not necessarily mean that the defendant will receive a long sentence or that he will be required to serve any sentence at all. The judge may impose such sentence as appears to him to be just with the limits fixed by law or in a proper case he may suspend sentence and place the defendant on probation.'

"We think an instruction in the language of this last quotation would have constituted reversible error. It amounts to a plain invitation to the jury to return a verdict of guilty and leave the consequences to the court. The information thus possessed by a juror could form the

---

1. 28 U.S.C.A. § 46(c).

basis for a potent argument to win over a doubtful or wavering juror. It could prejudice the right of a defendant to a fair trial on the issue of his guilt or innocence.

"While there are other matters contained in the handbook which are of doubtful propriety, we think what we have shown is sufficient for our present purpose."

Judge Major relied upon the persuasive opinion in People v. Schoos, 399 Ill. 527, 78 N.E.2d 245, 2 A.L.R.2d 1096, where the use of a similar publication, known as a "Jury Primer", was held cause for reversal of a criminal conviction. He cited United States ex rel. Toth v. Quarles, 350 U.S. 11, 23, 76 S.Ct. 1, 8, 100 L.Ed. 8 where the court quoted with approval from Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct. 296, 79 L.Ed. 603, as follows:

"Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care."

It is significant that Judge PARKINSON offers no disagreement with Judge Major's criticism of the handbook, recognizing that this court "gave minute and careful consideration to the contents of the handbook and held that it was prejudicial." Instead Judge PARKINSON refrains from considering the handbook issue, which the panel did decide. He is confronted with a situation where, neither in the district court nor in its briefs in this court, has the government contended that a challenge to the array is not the proper mode of attacking the use of the handbook. Actually the first time this point has been made by the government is in its petition for a rehearing in this court. The rule is well-settled that that is too late. Mitchell v. Greenough, 9 Cir., 100 F.2d 1006; Marion Steam Shovel Co. v. Bertino, 8 Cir., 82 F.2d 945, 948; Merriman v. Chicago & E. I. R. Co., 7 Cir., 66 F. 663; Otoe County Nat. Bank v. Delany, 8 Cir.,

88 F.2d 238, 250; A. F. Withrow Lumber Co. v. Glasgow Inv. Co., 4 Cir., 106 F. 363; Reece Folding Mach. Co. v. Fenwick, 1 Cir., 140 F. 287, 292. Recognizing that on this record we are not permitted to consider a point not seasonably raised, and are therefore required to ignore it, Judge PARKINSON says "This we must do." What there is about this case to justify this *ipse dixit*, he does not explain. He cites no authorities to sustain him.

The proceedings in this case particularly call for an application of the aforesaid rule. During the argument before the court *en banc* on petition for rehearing, Miss Lavin of counsel for appellant, in pointing out the disadvantage to which appellant's counsel had been put by the government's failure, in its main brief herein, to attack the challenge-to-the-array method of raising the question as to the handbook, intimated that as a matter of fact the point was also brought to the district court's attention *in another way*, which she felt she could not relate upon the argument on rehearing, inasmuch as that would require her to go outside the record. She stated that, in any event, she did not agree that the point had not been raised in the district court otherwise than by a challenge-to-the-array. Whereupon Chief Judge DUFFY asked her whether, as a matter of fact, defendant in the district court had otherwise raised the point. Miss Lavin responded that Mr. Callaghan, who was at the trial, had informed her that several of the jurors had been asked upon their *voir dire* whether they had read the handbook and they said that they had. Neither Mr. Callaghan nor assistant district attorney Lulinski, who were both present when Miss Lavin made this response, disagreed with her statement. Actually, Mr. Callaghan nodded in the affirmative.

If an attack had been seasonably made by the government on the efficacy of the challenge-to-the-array, appellant's counsel could have produced in this court the whole record pertaining to the attack upon the handbook in the district court.

In view of the situation thus presented to us, it is unfortunate that Judge Major's opinion on the handbook issue is discarded and that the courts of the country will have to wait until the point is again raised in some future criminal trial which results in a conviction and an appeal. I feel that the net result is that the wholesome effect of an opinion is dissipated and the administration of justice is left suspended on the handbook issue until it comes before a court of review at another time. Thus time and expense are unnecessarily wasted.

I would adhere to our first opinion herein.