UNITED STATES of America

v.

ALLIED STEVEDORING CORPORATION, John Ward and Michael Bowers and John Potter.

United States District Court
S. D. New York.
March 24, 1953.

See also 143 F.Supp. 947; 162 F. Supp. 879.

Paul W. Williams, U. S. Atty., for the S. D. of New York, New York City, for the United States. Joseph De Franco, Asst. U. S. Atty., New York City, of counsel.

Henry A. Lowenberg, New York City, for defendants John Ward and Michael Bowers.

PALMIERI, District Judge.

The defendants were convicted of violating Int.Rev.Code of 1939 § 145(b), 26 U.S.C.A. § 145(b), in that they had attempted to defeat and evade the income tax due from the corporate defendant for the year 1951. Judgments of conviction were entered on April 16, 1956, after a protracted jury trial. The convictions were affirmed[1] and defendants' petition for certiorari was denied[2] on June 3, 1957.

The defendants Bowers and Ward are now serving prison sentences. The defendant Potter is dead.

Now, almost two years after the judgments of conviction, the surviving defendants move for a new trial "on the ground that one of the jurors who sat in this case, John E. McLaughlin, and who had voted guilty, had in his possession a handbook for Instructions to Petit Jurors which contained principles of law governing the trial of criminal cases and that John E. McLaughlin had read the handbook before appearing for jury service in this case." Thereafter, the motion was amended to include "newly discovered evidence" as a further ground. This amendment was evidently made because of the time limitations of Fed.R.Crim.P.

33, 18 U.S.C.A., which provides that unless a motion for a new trial is based on newly discovered evidence, it must be made within five days after verdict or a finding of guilt. A motion based on newly discovered evidence may be made within two years after final judgment.

It is clear from the proceedings which have taken place following this motion that by whatever name it may be labelled, the sole ground for the relief sought is the alleged improper use of a juror's handbook by one of the jurors, Mr. John E. McLaughlin. A hearing was held at which Mr. McLaughlin was questioned; counsel for both sides were afforded three oral arguments, and they have submitted briefs.

After the first argument of the motion, it became apparent that the sole basis for the defendants' motion for a new trial was the possible application to this case of a decision by the Seventh Circuit in United States v. Gordon (July 16, 1957). Since that decision was again *sub judice*, the Seventh Circuit having granted reargument before the court *en banc*, I decided to await the result before proceeding further. I also thought it desirable to question the juror, Mr. McLaughlin, and to refresh my recollection of the trial proceedings involving the moving defendants.

On February 19, 1958, 253 F.2d 177, the Seventh Circuit in a decision comprising five separate opinions (including a concurrence by Judge Hastings in the opinions of Judge Parkinson and Chief Judge Duffy), withdrew its opinion of July 16, 1957, and, in effect, decided two matters:

First: that "[t]he only evidence offered by the defendant [in asserting error on appeal from his conviction after two trials] was that the handbooks were distributed to the prospective jurors with a suggestion that they be read. The record is completely devoid of any evidence that any members of the jury read the handbook or had any information as

1. 2 Cir., 1957, 241 F.2d 925.

2. 1957, 353 U.S. 984, 77 S.Ct. 1282, 1 L.Ed.2d 1143.

to its contents or, if read, would have been influenced thereby against the defendant. It was incumbent upon the defendant to introduce, or to offer, distinct evidence in support of the challenge and the failure to prove his contentions was fatal. Glasser v. U. S., 1942, 315 U.S. 60, 87, 62 S.Ct. 457, 86 L.Ed. 680."[3]

Second: "Assuming, *arguendo*, that the entire panel read the handbook and that the handbook did contain statements inimical to a defendant in a criminal case," the defendant should have made a challenge to the polls by an appropriate challenge for cause after inquiry on the *voir dire*. Not having done so, the defendant waived his rights.[4]

Despite the withdrawal of the Seventh Circuit's opinion of July 16, 1957, defendants here rely on it, and on the statements of Judges Finnegan and Schnackenberg, who partially dissented, in the opinion of February 19, 1958. But the earlier opinion, even if it were still vital, has no application here. In Gordon "the person to whom the petit jurors report at the commencement of their service, [testified] that she gave a copy of the handbook to each of the prospective jurors and told them it was 'a nice jury book and they should read it' * * *"[5] There was no such "official indoctrination" in this case.[6] Thus, the integrity of the jury system as a whole, which the first Gordon opinion held to be in issue in that case, and which obviated the requirement for a showing of prejudice to the individual defendant, is not in issue in this case.

There is no contention that the Handbook was distributed to the entire panel in this case, or that any suggestion was ever made that they read it. They were told at various times during the case that they were obliged to discharge their duties upon the admissible proof subject to the law as charged by the Court.

Counsel for the defendants does not deny this nor does he claim that any of the remaining eleven jurors who considered the verdict were in any way influenced by the Handbook. Indeed, he conceded that he rested solely on whatever use the juror McLaughlin made of the handbook; and he conceded that the other eleven jurors did not use the handbook.[7] The fact of its use by only one juror was substantiated by the report of an agent of the Federal Bureau of Investigation whom I requested to question the members of the jury after this motion was brought.

Of course, defendants' position is not supported by the majority holding in the February 19, 1958 opinion, summarized above. Passing the failure of defendants to raise this issue on the *voir dire*, I turn to a consideration of the evidence adduced on this motion to determine whether defendants were prejudiced by the use of the Handbook by the juror McLaughlin.

The position of the moving defendants was made clear by their counsel as follows:

"[The Court:] * * * Do we all assume or do you formally concede that the taint, if there was a taint, stems from whatever use the juror McLaughlin, Juror No. 12, made of this handbook?

"Mr. Lowenberg: That is correct.

"The Court: That the other eleven jurors did not use the handbook in any way?

---

3. United States v. Gordon, 7 Cir., 253 F. 2d at page 185.

4. Id., 253 F.2d at page 185.

5. Id., 253 F.2d at page 184.

6. Defendants' counsel, during the hearing on this motion, stated that "the Chief Clerk of this court told me that if a juror comes up to his office and asks

for a handbook he will give it to him." (Hearing of March 3, 1958, p. 67.) There was no contention, however, that any juror sought the Handbook before the trial of this case. It had been in Mr. McLaughlin's possession since his service on another panel some five years before he was called for duty in this case.

7. Hearing of January 23, 1958, p. 32.

"Mr. Lowenberg: I will concede that.

"The Court: So that we have to inquire into the use by McLaughlin of this handbook.

"Mr. Lowenberg: That is correct.

"The Court: And to ascertain the extent to which the verdict may have been affected or impaired by what McLaughlin did and by what McLaughlin alone did. Do you so concede?

"Mr. Lowenberg: That is correct. And I say it makes no difference, Judge, whether one juror did it, because after all, it must be a unanimous verdict.

\*     \*     \*     \*     \*     \*

"Mr. Lowenberg: \* \* \* I am coming in here on the theory that this juror was so indoctrinated with leading statements in this handbook, misinformation, and the absence of the protection that the accused enjoyed as a matter of right, constitutionally, and not as a matter of privilege."

(Hearing of January 23, 1958, pages 32, 33.)

The questioning of the juror McLaughlin provides a clear answer to these contentions. His answers show that he had read the Handbook, which he had obtained five years before, shortly before appearing in the instant case; and that his only reference to the Handbook was at the close of the long deliberations by the jury, when the verdict of Potter (now deceased) was being considered. In this connection, Mr. McLaughlin referred to the Handbook and all Mr. McLaughlin said was that the question of penalty was one for the Court, not the jury. The questioning of Mr. McLaughlin is reproduced in part as an appendix hereto and serves to illustrate what has just been said.

It follows that the defendants' motion for a new trial must be denied. On no conceivable basis can the use of the Handbook made here by the juror Mc-

Laughlin be deemed "newly discovered evidence" within the purview of Fed.R. Crim.P. 33. See Balestreri v. United States, 9 Cir., 1955, 224 F.2d 915, 916–917; United States v. Hiss, D.C.S.D.N.Y.1952, 107 F.Supp. 128, 136–137, affirmed on opinion below 2 Cir., 201 F.2d 372, certiorari denied 1953, 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368. All that Mr. McLaughlin did was to reaffirm a matter which was charged to the jury in a supplemental charge given in answer to the jury's question regarding a possible recommendation of lenity. (See appendix.) It now appears that his reaffirmation, the legal correctness of which is not challenged, related to the defendant Potter. Clearly this cannot afford the defendants any ground for asserting a basis for relief, even if their motions were timely.

Motions denied. So ordered.

Appendix

Transcript of hearing of March 3, 1958—questioning of Juror John E. McLaughlin.

"Q. Well, at any rate, can you tell me, when I direct your attention now to the time you were on the panel, without being called as a juror in the Allied Stevedoring case, can you tell me whether or not at that time you had this handbook like Court's Exhibit 1 in your possession? A. I couldn't say, your Honor, that I had it on me that day. If I didn't have it on me I probably had it home. I don't know whether or not I carried it that particular day.

"Q. Well, can you tell me after you were sworn as a juror whether you ever had occasion to look at this book? A. The only question that ever came up in my mind about this case had nothing to do with the guilt or innocence of any of the defendants. It dealt strictly with whether or not the jury should consider the penalties after finding a defendant guilty.

"The only discussion in the juryroom where the book would have been the least bit helpful or would have been used at

all would be in the case of the oldest defendant, John Potter, is that right?

"Q. Yes, John Potter. A. John Potter. One of the jurors mentioned in the juryroom that night that we had already found Mr. Potter guilty, and one of the jurors mentioned that that would be the same as sending Mr. Potter to jail for the rest of his life, and we ought to really consider it, because he is an old man, and I may have at that time said that that was none of the jury's business, that it was up to the judge as to the severity of the penalty.

"Q. Now, you recall that at one point the jury came back and asked for instructions? A. As to whether or not they could ask for leniency for Mr. Potter.

"Q. Well, I don't think they mentioned who the defendant was. A. No, they did not, no.

"Q. But I think they said that they wanted to know what their powers were with respect to recommending leniency? A. That is right. They came back into the courtroom and asked some instructions of your Honor as to whether or not, I think, they could request leniency for one of the defendants if they so felt.

"Q. And you remember that I went to great pains to indicate that it was very important that they first pass on the question of guilt or innocence, that the question of punishment was none of their business and should not in any way affect a decision with respect to the guilt or innocence of any defendant; and after that question was passed and if they found him guilty in accordance with the rules laid down in the charge, and only if they found him guilty, could they recommend leniency if they wanted to, and under those circumstances I think I said that I would give it consideration, although as a matter of law it was not binding and would not be binding upon me? A. Yes.

"Q. I think I said that. I sent for my charge, I am sure. A. I am quite sure your Honor did say something like that because it was in my mind that if we found a defendant guilty, that would be something for the jury to consider after finding him guilty, if it felt it had some expression for leniency.

"Mr. De Franco: That appears on page 4300 of the record, if your Honor please.

"Q. At any rate, Mr. McLaughlin, did you at any time during that trial while you talked to any of these jurors either during the time the trial went on or during the time you were considering the case after my charge make any use of this book in the sense that you took it out of your pocket and showed it to anybody, or in the sense of going into a corner and looking at it and then coming back and talking about what you read in the book? A. The only thought in my mind would be the question of whether or not the jury should consider the penalty after finding the defendant guilty. That is the only recollection I have, and I may have glanced at the book—I am not certain, but that is the only thing in the book that would have any bearing on the case, the question involving the penalty for the defendant.

"Q. Let me read this to you. I just found the part of the charge, the supplemental charge which I gave at 11:30, the day after the principal charge. The question was, 'Your Honor: is it within the power of the jury to recommend leniency for any or all of the defendants?' And I said, 'Now while you may make a recommendation of leniency for any or all of the defendants, it is not legally binding upon me. In the event one is made, however, I will give it consideration. But let me stress one thing: no consideration regarding the penalty which may be imposed should, in any way, affect your prior determination as to whether or not any or all of the defendants should be found guilty. In other words, you must be sure that your verdict is reached in accordance with the principles laid down in my charge, independent of any considerations regarding penalties, since those are matters which are part of the responsibility of the Court and are not properly a part of the func-

tion of the jury. After, and only after, a verdict is reached, and assuming that that verdict is a verdict of guilty, should you consider whether or not to make a recommendation of leniency. And in the event that you make one, I will give it consideration. You may resume your deliberations.'

"Then it says at 11:32 a. m. the jury left to resume their deliberations. At 12:20 p. m., almost an hour later, the jury resumed their seats in the jurybox and said they had found a verdict and so forth.

"Now, try to bring your mind back to that particular event and tell me whether or not at or about that time any use was made of the book as a book or as knowledge contained in the book? A. Well, that is what I am not certain of. I may have said that in my own experience on previous cases it had been brought to my attention as a juror that it is something that we are not to consider, the penalty; the penalty is the Judge's, he is still the person who sets the penalty, and we find the defendant guilty or not guilty as charged, and it is up to the Court to fix sentence, and we have nothing to do with the sentence. Now that is the only statement that I may have made as a result of having read one of those handbooks for jurors.

"Q. As I understand you then, it was as a result of reading this handbook some time prior to the trial? A. Yes.

"Q. Is that right? A. Yes.

"Q. It was not a matter of your showing the handbook to anybody or pulling the handbook out of your pocket in the juryroom? A. Well, I don't recall having taken it out of my pocket in the juryroom. I do recall the discussion about Mr. Potter, and I do recall entering into the discussion and making the statement that it was none of our business as jurors to concern ourselves with the penalty.

(Hearing of March 3, 1958, John E. McLaughlin questioned by the Court, pages 49 to 55)